**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   2:18-cr-115 |
| | ) |
| JEROME WILBURN, | ) |
| | ) |
| Defendant. | ) |

**OPINION**

Defendant Jerome Wilburn, who is facing a three-count indictment for heroin distribution and illegal firearms possession, is being held in pretrial detention in the Butler County Jail. Based on his age and history of acute pulmonary embolism, Wilburn seeks temporary release under 18 U.S.C. § 3142(i) due to the ongoing coronavirus pandemic. While Wilburn's concerns are genuine, when considered in conjunction with the danger he poses to the safety of the community or his risk of flight, they do not provide a sufficient basis for his temporary release. Wilburn's long history of criminal convictions for serious crimes—which includes illegal firearm possession, drug distribution, and two (2) violent sexual assaults—coupled with his prior parole violations and the potentially lengthy prison sentence he faces if convicted in this case, strongly counsel against granting him temporary release. Accordingly, Wilburn's Emergency Motion for Temporary Release (ECF No. 97), is **DENIED without prejudice**.

**I.    BACKGROUND**

As part of a DEA investigation into suspected heroin trafficking between the greater Detroit and Pittsburgh regions, the Pennsylvania State Police ("PSP") stopped a vehicle believed to be transporting heroin shortly after it travelled over the Ohio-Pennsylvania state line. Defendant Jerome Wilburn was in the vehicle's passenger seat when the PSP conducted the stop. Though the

parties dispute the lawfulness of that stop, no one disputes that a search of the vehicle uncovered a substantial quantity of heroin and a firearm. And, following the later execution of a search warrant at an apartment allegedly linked to Wilburn, the DEA uncovered more heroin and firearms. The yield from the vehicle stop and apartment search led a federal grand jury to indict Wilburn for conspiracy to possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846; possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(i); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 15.)

Shortly after Wilburn's arrest, he made an initial appearance before Magistrate Judge Pesto in this District. (ECF No. 4.) The United States requested detention, which Magistrate Judge Pesto granted on a temporary basis pending a later detention hearing. (ECF Nos. 5 and 6.) At the detention hearing, before Magistrate Judge Lenihan, the United States argued that Wilburn should be detained pending trial because the charges against him raise a rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3). The United States argued that Wilburn's criminal history, potential sentence if convicted on these charges, limited ties to the community, and past parole violations evidence both his danger to the safety of the community and his risk of flight. (Detention Hr'g Tr., ECF No. 45, at 18:18–19:22.)

At the detention hearing, Judge Lenihan reviewed the factors set out in the Bail Reform Act. First, Judge Lenihan found that Wilburn's alleged "offense . . . involves both very dangerous drugs, heroin, and also firearms, not just one, but two." (*Id.* at 21:8–10.) Second, that "[t]he weight of evidence against the Defendant is fairly strong," since he was in the car where the heroin and handgun were found (albeit with another person in the car) and there was indicia of his found at

the apartment searched by the DEA. (*Id.* at 21:11–22.) As for Wilburn's history and characteristics, Judge Lenihan noted Wilburn's "at least three, maybe four violations while [he was] on parole," and that Wilburn's prior felony drug convictions meant he faced a lengthy prison sentence if convicted. (*Id.* at 22:1–7.) In addition, Judge Lenihan observed Wilburn's lack of "ties to the community, no family here; family, in fact, in the state of Michigan. And no job at all. And no employment history that I can see." (*Id.* at 22:8–10.) As a result, Judge Lenihan found that Wilburn did not rebut the presumption of detention under § 3142(e)(3). (Detention Order, ECF No. 12.)

Following the detention order, Wilburn filed several pretrial motions, including a motion to suppress evidence. (ECF Nos. 49–52.) The Court held an evidentiary hearing on Wilburn's suppression motion in September 2019, and the parties filed post-hearing briefs. (ECF Nos. 78, 86–87, 90, 93, and 97.) While the Court was considering Wilburn's suppression motion, the coronavirus pandemic altered virtually every aspect of modern life, which relevant to the Court's task here, includes federal criminal litigation. Wilburn, who is currently being held at the Butler County Jail, filed an Emergency Motion for Temporary Release Under 18 U.S.C. § 3142(i) seeking temporary release to the custody of his mother in Detroit, Michigan. (ECF No. 97.) The Court ordered Wilburn and the United States to confer to see if they could reach an agreeable outcome with respect to Wilburn's motion. (ECF No. 98.) The parties could not reach an agreeable outcome, and the United States responded in opposition to Wilburn's motion seeking temporary release. (ECF Nos. 99 and 100.) Wilburn filed a reply and the Court held telephonic oral argument on Wilburn's motion.[1] (ECF Nos. 102 and 106.) With that, Wilburn's Emergency Motion for Temporary Release is ripe for disposition.

---

[1] Represented by counsel, Wilburn consented to the Court holding oral argument on his motion without him present in person or telephonically. And in the Court's estimation, Federal Rule of Criminal Procedure 43 did not require

3

## II. DISCUSSION

Wilburn does not seek to reopen his detention hearing under 18 U.S.C. § 3142(f), but rather seeks temporary release under 18 U.S.C. § 3142(i). (ECF No. 97.) Section 3142(i) provides: "[t]he judicial officer may . . . permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *Id.* § 3142(i). In making the motion, the burden rests with Wilburn to show that § 3142(i) permits his temporary release. *See, e.g.*, *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (citing *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011)). And to meet this burden, the defendant should present an individualized argument why temporary release is appropriate; generalized or speculative arguments are insufficient.[2] *See, e.g.*, *United States v. Lee*, No. 19-cr-298, 2020 WL 1541049, at *6 (D.D.C. Mar. 30, 2020).

In short, Wilburn must demonstrate the presence of two (2) factors. First, that his temporary release is necessary for the preparation of his defense or another compelling reason. 18 U.S.C. § 3142(i). Second, that he could be released to the custody of the United States marshal or another appropriate person. *Id.*

### A. "Another Compelling Reason"

As for the first inquiry, because Wilburn does not argue that temporary release is necessary to prepare for his defense, his motion hinges on his ability to establish that temporary release is

---

Wilburn's presence for the parties' legal arguments regarding his motion. *See* Fed. R. Crim. P. 43(b)(3).

[2] "[T]emporary release might be warranted notwithstanding the lack of any individualized reason for releasing the particular detainee, such as the potentially compelling generalized reason of indifference, ineptitude, or sheer inability on the part of corrections authorities to ensure the safety of the prison's population." *Lee*, 2020 WL 1541049, at *6. As the Court explains below, however, no such circumstances are present here.

4

necessary for "another compelling reason." (ECF No. 97, at 1–2.) Section 3142(i) does not define "compelling reason"; a term with substantial ambiguity. To resolve ambiguity in a statute's terms, the Court should consider the "language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). In doing so, the Court should endeavor to interpret the ambiguous provision so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). And rather than examining the provision isolation, the Court should examine related provisions in other parts of the U.S. Code. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 776, (2008).

Starting at the most granular level, courts should give an ambiguous term its ordinary meaning. *See Yates v. United States*, 574 U.S. 528, 537 (2015). Here, "compelling," as defined in dictionaries contemporaneous with § 3142(i) becoming law, means "[t]o urge irresistibly, to constrain, oblige, force." *See Compel*, Oxford English Dictionary (2d ed. 1989). What's more, because the § 3142(i) states: "preparation of the person's defense or for *another* compelling reason," preparation for one's defense provides an example of a compelling reason. 18 U.S.C. § 3142(i) (emphasis added). Beyond that, however, the § 3142(i) does little to put the term "compelling" in context.

As other courts have observed, until the emergence of the coronavirus pandemic, there was relatively little case law on interpreting § 3142(i)'s "compelling reason" prong. *See Lee*, 2020 WL 1541049, at *3 (noting the "limited prior authority" interpreting "another compelling reason"). In the few cases that had interpreted "another compelling reason," courts tended to grant temporary release only to defendants suffering from terminal illnesses or truly severe injuries. *See id.* at *3

& n.3. In the Court's estimation these prior decisions interpreting "compelling reason" to include a defendant's serious medical needs or condition are consistent with the term's ordinary meaning. The question then becomes, should the Court look only at the "compelling reason" that is advanced to the Court or which is otherwise present, or do other considerations play a role in the temporary release determination?

To answer this, the Court's should zoom out, so to speak, and consider § 3142(i) in conjunction with the rest of that statute. One particularly critical issue in interpreting "compelling reason" is how § 3142(i) interacts with factors considered in the initial bail determination under § 3142(g). One line of coronavirus-related cases hold that "section 3142(i) provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination." *Id.* at *3; *Stephens*, 2020 WL 1295155, at *2. But in another oft-cited coronavirus case, the court considered the "original grounds for the defendant's pretrial detention" as the first factor in a four-factor test. *See United States v. Clark*, No. 19-cr-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020); *see also United States v. Boatwright*, No. 19-cr-00301, 2020 WL 1639855, at *5 (D. Nev. Apr. 2, 2020) ("[T]he Court takes into consideration whether Defendant has presented such compelling reasons that effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order.")[3].

---

[3] The factors identified by the Court in *Clark* are (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. The *Clark* Court went on to observe that it was not weighing these factors equally, but instead would consider them in the context of the entire matter.

In the Court's estimation, the "compelling reason" prong in § 3142(i)—and the "preparation of the person's defense" prong, for that matter—is not simply another factor for the Court to consider alongside those outlined in § 3142(g). In part, that is because Congress mandated consideration of the § 3142(g) factors during the initial bail determination but did not place such importance on § 3142(i)'s "compelling reason" prong. *See* 18 U.S.C. § 3142(g) ("The judicial officer shall . . . take into account the available information concerning" the enumerated factors.). At the same time, if the § 3142(g) factors counseled in favor of pretrial release, the defendant should not have been detained in the first place and therefore would not need to rely on § 3142(i) for temporary relief. So in some ways, that provision appears to presume that detention is otherwise proper under subsection (g), and therefore assigning too much weight to the specific factors that went into the initial detention decision might unduly frustrate the purpose behind § 3142(i). Undue weight placed on the § 3142(g) factors when determining if a "compelling reason" warrants temporary release is also inappropriate given the fact that § 3142(i) only provides *temporary* pretrial release, not indefinite pretrial release.

Yet, as to whether or how much the specific § 3142(g) factors should weigh in the Court's temporary release decision under § 3142(i), the overwhelming majority of courts agree that an examination of the defendant's dangerousness and risk of flight is appropriate when deciding a temporary release motion. For instance, in *United States v. Stephens*, a case holding that § 3142(i) provides a release mechanism distinct from § 3142(f), the court granted temporary release after noting that that defendant did not pose a danger to the community during the court's earlier § 3142(f) analysis. 2020 WL 1295155, at *2–3; *see also Lee*, 2020 WL 1541049, at *6 ("[T]his Court agrees with those recent precedents that have rejected emergency motions for release of

7

otherwise healthy *and potentially violent defendants* . . . ." (emphasis added)). No decision, to the Court's knowledge, entirely ignored consideration of the defendant's danger or flight risk when deciding a temporary release motion.

Finally, zooming out further, when the Court interprets "compelling reason" it should do so against the backdrop of the Bail Reform Act as a whole. And if there is anything that permeates the Bail Reform Act, it is Congress's intent that courts consider the defendant's dangerousness and risk of flight when making detention determinations. *See* 18 U.S.C. § 3142(b), (c)(1), (d)(2), (e)–(g) (considering danger and risk of flight during pretrial detention); *Id.* § 3143(a)(1), (a)(2)(B), (b)(1)(A) (considering danger and risk of flight pending sentence or appeal); *Id.* § 3145(c) (considering danger and risk of flight during appeal from a release or detention order). It would strike the Court as odd, then, that § 3142(i)'s "compelling reason" prong would ignore a defendant's danger or flight risk. This is especially true given the absence of an explicit intention to do so in § 3142(i)'s text.[4]

Thus, giving "compelling reason" its ordinary meaning, considering the other sections in § 3142, as well as the Bail Reform Act as a whole, the Court concludes that while a defendant's medical conditions can provide a compelling reason for temporary release, the defendant's danger to the community and risk of flight must also play a meaningful role in the Court's decision as it considers whether a "temporary release" is compelling. In short, in the Court's judgment, the

---

[4] To the extent one considers legislative history to inform the interpretation of a statute's text, the Bail Reform Act's legislative history confirms the Court's reading of § 3142(i). Section 3142(i) remains unaltered from how it first appeared in the Bail Reform Act of 1984. *See* Bail Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. 1, § 203(a), 98 Stat. 1976, 1981 (1984). The legislative materials prepared as Congress considered the Bail Reform Act of 1984, broadly speaking, evidence an explicit intent for courts to consider both the defendant's risk of flight and danger to the safety of the community when making bail determinations. *See* S. Rep. No. 98-225, at 3–8 (1984); *see also United States v. Salerno*, 481 U.S. 739, 747 (1987) (discussing the Bail Reform Act's legislative history).

8

analysis to be used is not a simple balancing of the subsection (g) and (i) factors one against the other, but instead, an assessment of the complete context carries particular relevance.

Here, Wilburn argues that temporary release is appropriate given his history of acute pulmonary embolism and his age, fifty-five (55). (ECF No. 97, at 5–7.) These health factors, Wilburn argues, place him in a high-risk group for serious complications if he contracts COVID-19, the disease caused by the coronavirus. (*Id.*; ECF No. 102-1.) Yet, Wilburn's counsel acknowledged that Wilburn has not been taking his pulmonary embolism medication as prescribed, apparently due to significant gastric distress that he believes was generated by that medication. But the record also does not reveal that any alternative therapy was thereafter prescribed or undertaken—all of which creates some significant uncertainty as to the currency and severity of that condition. And the medical records submitted to the Court appear to show that his last examination or treatment for acute pulmonary embolism was in 2016. Further, the Court notes that it appears that the diagnosis at that time was of an acute condition, and the record here does not demonstrate that it is either current or chronic. That, coupled with Wilburn's lack of current engagement in or compliance with any medical regimen tied to that condition, in the Court's estimation diminishes the weight that it should be accorded.

Wilburn further argues that, given the physical layout of BCJ and the procedures put in place by BCJ leadership, he is unable to accomplish the sort of "social distancing" recommended by public health officials. *See* Ctr. for Disease Control and Prevention, *Social Distancing, Quarantine, and Isolation* (last visited Apr. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html. And he argues that BCJ's steps taken to mitigate the virus entering the facility "fall short" of what public health officials recommend.

As for how the Court should factor dangerousness and risk of flight into its temporary release decision, Wilburn essentially urged to Court to place little to no weight on those factors. Instead, as Wilburn asserted at oral argument, given the potential seriousness of complication if he contracts COVID-19, any heightened risk from incarceration provides a compelling reason for temporary release. Yet, as the Court explained above, a fair reading of § 3142(i) does not permit the Court to ignore Wilburn's danger to the safety of the community or risk of flight.

The United States, on the other hand, strongly urged the Court to consider Wilburn's danger to the safety of the community and flight risk. The United States noted Wilburn's history of multiple parole violations as evidence that the Court should not have any confidence that Wilburn would follow the terms of temporary release. (ECF No. 100, at 3–4.) The United States also highlighted Wilburn's multiple prior felony drug convictions, as well as his convictions for two (2) separate violent sexual assaults. (*Id.* at 2–3.) Finally, with respect to Wilburn's dangerousness, the United States pointed to the serious nature of the charges involved in this case—heroin trafficking and unlawful possession of multiple firearms. If convicted on these charges, the United States argues, Wilburn's Armed Career Criminal Act eligibility and career offender enhancement means that he would face a substantial prison sentence. (*Id.* at 1–2.)

As for the mitigation steps take at BCJ, the United States asserts that prison leadership have made a concerted and effective effort to protect the inmates housed there. (*Id.* at 6–7.) Among others, these mitigation efforts include placing Wilburn in his own cell; regularly cleaning frequently touched surfaces; conducting temperature screening on staff; substantially limiting visitation; and preemptively making plans to provide medical care if an inmate becomes ill with COVID-19. (*Id.*) And, as of this writing, no inmate at BCJ has tested positive for the coronavirus.

10

In the Court's estimation, while medical conditions can provide a compelling reason for temporary release, Wilburn's history of acute pulmonary embolism as it is currently reflected in the record is not of a nature to in and of itself generate a "compelling" reason for temporary release. And, as explained above, it does not sufficiently diminish the danger his release poses to the safety of the community or his risk of flight, especially since as noted, the record does not reveal an individual current medical condition of substantial seriousness so as to warrant temporary release no matter Wilburn's risk of flight or dangerousness to the community.

It is legitimate for the United States to also point to Wilburn's history of non-compliance with the terms of his parole on prior convictions. While Wilburn argues that the Court could impose conditions of release here that are more serious than those imposed in the past and that would ensure his compliance, it unclear to the Court why Wilburn's failure to comply with relatively light conditions in the past would suggest he could comply with much more stringent ones now. It would appear to the Court that the opposite would more logically be the case. Wilburn's extensive criminal history also leads the Court to conclude that he poses a danger to the safety of the community. That criminal history is not for petty offenses, but rather involves a firearm offense, multiple drug offenses, and two (2) extremely violent sexual assaults, the second committed while he was awaiting sentencing for the first. (ECF No. 100, at 2–4.) And while Wilburn argues that these convictions are from long ago, the Court notes that Wilburn spent much of the intervening period incarcerated for these various offenses. It is not the case that Wilburn has demonstrated any significant period of law-abiding conduct, and in the Court's estimation, the passage of time while he has been in prison has not dissipated the extraordinarily violent nature of those crimes for which he was convicted. He has demonstrated both the capacity and willingness

to violently endanger and harm others, and to evade the particular obligations that the law placed on him while he was on parole or probation and committing those crimes.

Wilburn also poses a very real risk of flight for several reasons. For starters, as Magistrate Judge Lenihan noted during Wilburn's detention hearing, he has limited ties to Pittsburgh and essentially no work history. In addition, if convicted, Wilburn faces a considerable prison sentence under the applicable statutory mandatory minimums, as well as the career offender enhancement under the advisory Sentencing Guidelines. So Wilburn has a real incentive to flee. And while Wilburn points the Court to certain data he says shows the high rate of appearance by individuals released pending trial, it is not at all clear that the individuals who make up that sample have the history of parole non-compliance, and potential for a long mandatory prison sentences, that Wilburn's case presents.

Finally, the Court cannot accept Wilburn's argument that *any* risk of contracting the coronavirus while incarcerated warrants temporary release under § 3142(i). With near uniformity, courts have declined to accept such generalized arguments. *See, e.g.*, *Lee*, 2020 WL 1541049, at *6. And when courts have been more willing to accept generalized risk arguments as a "compelling reason" for release, it has been in the context of "indifference, ineptitude, or sheer inability on the part of corrections authorities to ensure the safety of the prison's population." *Id.* Here, BCJ officials appear on this record to have taken reasonable steps to mitigate the risk of an outbreak in the prison and to ensure the medical care of the inmates housed there should anyone contract the coronavirus. It is not the case that the BCJ officials have been shown to be indifferent, inept, or unable to implement preemptive measures.

In the end, Wilburn does not demonstrate a compelling reason warranting his temporary release under § 3142(i). Wilburn has presented some evidence of individualized health concerns. But the Court must consider those health concerns alongside the danger Wilburn poses to the safety of the community and his risk of flight.

### B. "Another Appropriate Person"

The above analysis is a sufficient reason to deny Wilburn's temporary release motion. Yet there is another basis for the Court to deny the motion. Section 3142(i) states that any temporary release, should the court grant it, must be to the United States Marshal or "another appropriate person." 18 U.S.C. § 3142(i). In some instances, a parent or other relative can act as a suitable temporary custodian. *See Stephens*, 2020 WL 1295155, at *3. Yet the Court is obligated to scrutinize the proposed release.

Here, Wilburn's plan, should the Court grant him temporary release under § 3142(i), is to travel to Detroit, Michigan to reside with his septuagenarian mother. Given the state of affairs as now exist, this gives the Court substantial concern when determining if Wilburn's mother is "another appropriate person" who could serve as his custodian. Apart from the reality that due to her age alone, Wilburn's mother is at an enhanced risk of serious illness should she contract the coronavirus, as the Court observed during the oral argument on this Motion, leading public health officials have referred to Detroit as a "hot spot" for the coronavirus in the United States. *See* Lee DiVito, *Dr. Fauci Says He's Worried About Coronavirus Spread in Detroit*, Detroit Metro Times (March 30, 2020), https://www.metrotimes.com/news-hits/archives/2020/03/30/dr-fauci-says-hes-worried-about-coronavirus-spread-in-detroit. So Wilburn's plan to travel from Pittsburgh to Detroit poses a risk his elderly mother, the other inmates at BCJ (or any other detention center)

13

who will reside with Wilburn once his temporary release ends, and to Wilburn himself—although he argues the Court should not consider the risks posed by his planned travel to Detroit.

In the Court's estimation, where a central premise of his release argument is the concept that his current location creates an unacceptable risk of infection and medical harm, it is inappropriate to then dismiss an examination of those same risks in his other suggested setting. Where the point of the Motion is to get Wilburn out of what he considers to be a high-risk situation, in the Court's estimation, it is also necessary for the Court to consider whether his release plan nonetheless puts him in just such a situation. All of these things counsel against concluding that Wilburn's mother, in Detroit, is an appropriate person to serve as his custodian during any temporary release.

### III.  CONCLUSION

The Court understands that Wilburn's concern for his health led him to seek temporary release. But the Court must also consider his danger to the safety of the community and risk of flight, along with the terms of any temporary release. Those considerations, all considered in the overall context of these matters, strongly tilt in favor of Wilburn's continued detention. Accordingly, Wilburn's Emergency Motion for Temporary Release (ECF No. 97), is **DENIED without prejudice**.

/s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: April 17, 2019
cc:      All counsel of record