**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,     )
     )
     )
     v.     )
     )   2:18-cr-115
     )
JEROME WILBURN,     )
     )
     Defendant.     )

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

Agents with the Drug Enforcement Administration ("DEA") suspected Defendant Jerome Wilburn of trafficking heroin between Detroit, Michigan, and Pittsburgh, Pennsylvania. They began looking into Wilburn's conduct using some classic investigative methods—confidential sources and toll records requests, for example—as well as some newer tools, like cell phone location tracking. In the end, Wilburn's arrest resulted from another vintage law enforcement method: a traffic stop.

Wilburn now challenges many actions taken by the DEA and its colleagues at the Pennsylvania State Police during the investigation into his alleged criminal activity. In particular, Wilburn claims that two search warrants the DEA obtained lacked probable cause. And he claims that the traffic stop that led to his arrest violated his Fourth Amendment right to be free from unreasonable seizure. As a result, Wilburn argues, the Court is bound to suppress all of the evidence against him. But, for the reasons that follow, the Court concludes that the Fourth Amendment does not require it to do so. Thus, Wilburn's Motion to Suppress Evidence (ECF No. 52) is denied.

## I.   **BACKGROUND**

In April 2018, a federal grand jury returned a three-count indictment against Wilburn. (ECF No. 14.) Count I charged Wilburn with conspiracy to possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846. (*Id*. at 1.) Count II charged him with possession with intent to deliver 100 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(i). (*Id.* at 2.) Finally, Count III charged him with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (*Id.* at 3.)

Wilburn moved to suppress all evidence against him. (ECF No. 52.) The United States responded to Wilburn's motion twice (ECF Nos. 66; 71), and the Court set an evidentiary hearing.[1] (ECF No. 76.) The parties presented witnesses and documentary evidence at the evidentiary hearing. On Wilburn's request, the Court granted leave to obtain an official transcript and submit post-hearing briefing. (ECF No. 79.) Wilburn filed proposed findings of fact and conclusions of law. (ECF No. 86.) And the United States responded in turn. (ECF No. 87.) Next, Wilburn replied. (ECF No. 90.) Then, to address a handful of discrete issues in greater depth, the parties—with the Court's permission—provided a sur-reply and sur-sur-reply. (ECF Nos. 93 and 96.)

While the Court considered Wilburn's motion, the coronavirus pandemic emerged. In response to the pandemic, our Court issued an Administrative Order applicable to all criminal cases in the District, including Wilburn's. *See In re Administrative Order Concerning Jury Trials and Certain Other Proceedings Relative to COVID-19 Matters*, Misc. No. 2:20-mc-394-MRH (W.D. Pa. Mar. 13, 2020.) Then, while the Court's Administrative Order was in effect, the Third

---

[1] The United States' initial response, ECF No. 66, did not address the overall merits of Wilburn's suppression motion and instead argued that Wilburn failed to demonstrate his standing to challenge the searches and seizures that yielded the evidence at issue, and therefore urged the denial of both the suppression motion and of a suppression hearing for that reason. It did briefly (one paragraph) speak to a portion of Wilburn's motion relative to telephone toll records. Wilburn replied (ECF No. 70), and the United States provided another pre-hearing filing, (ECF No. 71), that modestly addressed the merits of Wilburn's suppression motion.

Circuit issued two precedential opinions that potentially impacted Wilburn's motion—*United States v. Garner*, 961 F.3d 264 (3d Cir. 2020), *cert. denied sub nom. Fruit v. United States*, 141 S. Ct. 687 (2020) and *United States v. Wilson*, 960 F.3d 136 (3d Cir. 2020). The Court asked the parties to file supplemental briefs addressing these new precedential Third Circuit decisions, which the parties supplied. (ECF Nos. 109; 110; and 111.)

## II.   FACTUAL FINDINGS

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). So it is for the district judge to determine the credibility of witnesses, weigh the evidence, and draw any appropriate conclusions and inferences from the evidence. *Id.*

Two witnesses testified at the suppression hearing. The first was DEA Agent Melissa Laukaitis, who mainly testified about the two search warrants Wilburn challenges. The second witness was Pennsylvania State Trooper Justin Coda, who testified about the traffic stop. In the Court's estimation, both witnesses testified credibly. Their testimony, coupled with documentary evidence admitted during the hearing, provides the factual record that the Court considers when deciding Wilburn's motion.

### A.   DEA Agent Melissa Laukaitis's Testimony

Wilburn called Agent Laukaitis as a witness to establish his standing to challenge two search warrants the United States obtained in this case.[2] (Tr., ECF No. 85, at 27:18–22.) She did this in response to the Court's at least implicit (but as it turned out, incorrect) acceptance of the Government's argument that Wilburn had to elicit in-court testimony on that point in the first place.

---

[2] As the Court discusses below, that was the only purpose for which Agent Laukaitis testified.

On the stand, Agent Laukaitis testified that she participated in an investigation of Wilburn. (*Id.* at 28:15–17.) And as part of that investigation she learned from a confidential source that Wilburn used a 412-area code cell phone number. (*Id.* at 29:5–14.) The confidential source, Agent Laukaitis testified, personally spoke to Wilburn on that cell phone number in late February or early March 2018. (*Id.* at 29:16–24.)

Once she identified the target telephone number, Agent Laukaitis served an administrative subpoena on Sprint Wireless—the wireless provider for that number—to obtain toll records and subscriber information. (*Id.* at 29:25–30:7.) Sprint provided the subscriber information, which listed Bella and Semi Davis as the subscribers.[3] (*Id.* at 30:11–17; 38:19–23.) Yet Agent Laukaitis testified that other people being listed as the subscribers did not rule out Wilburn using the phone. (*Id.*) As for the toll records, Agent Laukaitis examined the incoming and outgoing calls to identify frequent contacts. (*Id.* at 30:21–31:11.) From that analysis, she found that the target telephone number routinely called numbers known from other DEA investigations across the country—including Michigan. (*Id.*) As with any toll records request, however, Sprint did not provide the contents of any calls or other communications. (*Id.* at 31:12–18.)

From her analysis of the toll records, Agent Laukaitis believed that Wilburn used the target phone number. (*Id.* at 31:19–31:4.) Having reached that conclusion, Agent Laukaitis then applied for a search warrant to obtain cell site location information from the target phone number. (*Id.* at 32:5–8.) As part of that warrant request, Agent Laukaitis provided an affidavit of probable cause—admitted into the hearing record as Defense Exhibit A.[4] (*Id.* at 32:13–33:7.)

---

[3] On cross-examination, Agent Laukaitis testified that she did not determine whether Bella and Semi Davis are real people or fictitious identities. (ECF No. 85, at 38:23–39:17.)

[4] Defense Exhibit A is the same document attached to Wilburn's Motion to Suppress at ECF No. 52-1.

Agent Laukaitis's affidavit, submitted on March 12, 2018, included many of the standard bells and whistles. It listed her training and experience—12 years with the DEA, familiarity with narcotics investigations, and training on a wide array of investigatory techniques. (ECF No. 52-1, at 1–2.) The application listed the target Sprint cell phone number and the fact that Sprint's information showed Bella and Semi Davis as the subscribers. (*Id.* at 2.) And the application sought permission to obtain prospective cell site location information for the cell phone. (*Id.* at 2–3.) Agent Laukaitis's affidavit made clear that the DEA suspected Wilburn of trafficking heroin in and into the Western District of Pennsylvania. (*Id.*) Agent Laukaitis listed five sources of information: First, her personal knowledge. Second, "surveillance that [had] been reported to [her], either directly or indirectly." Third, "review of telephone toll records and pen register/trap and trace information." Fourth, "independent investigation by local law enforcement organizations." And fifth, "confidential source information." (*Id.* at 4–5.)

A significant portion of the affidavit's information, however, came from that confidential source ("confidential source"). Agent Laukaitis noted that the confidential source "agreed to cooperate with law enforcement in hopes of judicial consideration for pending recent drug charges." (*Id.* at 6.) According to the affidavit, the confidential source had a longstanding relationship with Wilburn and assisted him during heroin transactions. (*Id.*) As part of that assistance, the confidential source would call Wilburn on the target Sprint cell phone number and discuss potential drug transactions. (*Id.* at 6–7.) And the confidential source told the DEA that Wilburn's drug trafficking involved transporting large amounts of heroin from Detroit to West Virginia and Pittsburgh. (*Id.*) In fact, in the days before Agent Laukaitis's warrant application, the confidential source learned that Wilburn would be "leaving for Detroit with another person." (*Id.*) That planned trip to Detroit, the confidential source told the DEA, was to buy more heroin to sell in

the Pittsburgh area. (*Id.* at 7.) Agent Laukaitis stated in the application that the confidential source "has been considered a reliable source of information by law enforcement." (*Id.* at 6.) But the affidavit did not refer to prior reliable information provided by the confidential source that would be presented to persuade a judge to conclude that the confidential source was properly seen as reliable.

Beyond the confidential source information, the affidavit relied on two additional pieces of information. The first was Wilburn's long criminal record. (*Id.* at 7.) Wilburn's criminal history included convictions for sexual assault, several heroin trafficking charges, and firearms offenses. (*Id.*) As a result of these many prior convictions, Agent Laukaitis stated that Wilburn served several long prison sentences. (*Id.*)

The second other piece of information came from the toll records for the target cell phone— obtained with the earlier administrative subpoena. (*Id.* at 7–8.) The toll records showed multiple calls between the target cell phone that Agent Laukaitis believed Wilburn possessed, and phone numbers in the Detroit area. (*Id.*) That fact, Agent Laukaitis stated, supported the confidential source's information that Wilburn's heroin source was in Detroit. (*Id.*) So obtaining cell site location information for Wilburn's phone would be vital to identifying the exact location of his supplier. (*Id.* at 8.)

Those three pieces of information—the confidential source, Wilburn's criminal history, and the toll records analysis—Agent Laukaitis wrote, provided probable cause to obtain a warrant for prospective cell site location information from the target cell phone. (*Id.* at 8.) A United States Magistrate Judge agreed, and then issued the warrant that Agent Laukaitis requested—what this Opinion will call the "Cell Site Location Information Warrant"—on March 12, 2018. (*Id.* at 11.)

On the witness stand, Agent Laukaitis testified that she tracked the target cell phone location after the Magistrate Judge issued the Cell Site Location Information Warrant. (ECF No.

85, at 33:11–34:17.) While she could not say with certainty that Wilburn alone used the phone while she tracked its location, Agent Laukaitis stated that she believed he possessed it for most of that time. (*Id.* at 35:7–14.) The cell site location data showed that the target phone spent significant time at an apartment complex on Webster Avenue in Pittsburgh. (*Id.* at 35:15–36:18.) And information from the confidential source suggested Wilburn's association with that apartment. (*Id.*) What's more, information in a DEA database connecting the apartment to Wilburn's known associates further linked Wilburn to the Webster Ave. apartment. (*Id.*) All of this led Agent Laukaitis to believe that Wilburn lived at the Webster Ave. apartment. (*Id.* at 36:6–15.) As a result, she sought a federal search warrant for the apartment. (*Id.* at 36:12–18.)

The Court admitted Agent Laukaitis's application for a warrant to search the Webster Ave. apartment into the record in these proceedings without objection. (*Id.* at 37:17–22.) In that warrant application—submitted to the federal Magistrate Judge on March 22, 2018—Agent Laukaitis recounted much of the same confidential source information that she included in the Cell Site Location Information Warrant. (ECF No. 52-3.) The Webster Ave. search warrant application, however, contained some new information. For starters, Agent Laukaitis stated that the confidential source had identified an associate of Wilburn's—Leroy Buttrom—who the confidential source communicated with shortly before the warrant application. (*Id.* at 5.) In that conversation, Buttrom allegedly told the confidential source that he was in Detroit to pick up a resupply of heroin to bring back to Pittsburgh. (*Id.* at 5–6.) And cell site location information for Buttrom's phone, obtained using a warrant separate from Wilburn's, showed that he also frequented the Webster Ave. apartment. (*Id.*) The affidavit also stated that the DEA believed that Wilburn resided at the Webster Ave. apartment. (*Id.* at 6.)

The critical new information in the Webster Ave. warrant application was the confidential source's personal observations at the apartment. In the two months before Agent Laukaitis submitted the Webster Ave. warrant application, and as recently as three weeks before that submission, the confidential source "witnessed large amounts of heroin [and] processing materials" at the Webster Ave. apartment. (*Id.*) What's more, the confidential source "observed Wilburn with a black handgun" at the apartment. (*Id.*) Agent Laukaitis also stated in her warrant application that the confidential source had been at the apartment just days earlier but did not say that the confidential source observed drug trafficking activity during that visit. (*Id.*) Instead, the confidential source learned that Wilburn was in Detroit to pick up more heroin. (*Id.*) And Agent Laukaitis stated that location monitoring of Wilburn's phone confirmed that he was in Detroit the day before she applied for the apartment search warrant. (*Id.*)

Along with the information from the previously mentioned confidential source, Agent Laukaitis provided two additional sources. The first was another confidential source ("Detroit confidential source") who informed the DEA's Detroit office that Wilburn trafficked large amounts of heroin from the Detroit area. (*Id.* at 4.) Second, toll record information showed Wilburn's Sprint cell phone making several calls to two known associates with connections to the Webster Ave. apartment. (*Id.* at 6–7.) Based on the information in Agent Laukaitis's affidavit, a United States Magistrate Judge issued the warrant to search the Webster Ave. apartment ("Webster Ave. Warrant"). (*Id.* at 14.)

At the suppression hearing, Agent Laukaitis testified that she was part of the team that executed the Webster Ave. Warrant on March 22, 2018. (ECF No. 85, at 38:2–12.) During that search, law enforcement recovered multiple pieces of indicia for Wilburn. (*Id.*) Based on that

indicia and the cell site location information, the DEA concluded that Wilburn had in fact resided at the Webster Ave. apartment. (*Id.*)

The factual findings recounted above came out during Wilburn's direct examination of Agent Laukaitis. On cross-examination, the United States asked Agent Laukaitis only three questions—all related to the Sprint subscriber information obtained by the administrative subpoena. (*Id.* at 38:19–39:6.) So the entirety of Agent Laukaitis's testimony related to the Cell Site Location Information Warrant and Webster Ave. Warrant applications.[5] For testimony on the traffic stop that led to Wilburn's arrest, the United States called Pennsylvania State Trooper Coda (and only Trooper Coda) to the stand.

### B.  State Trooper Justin Coda's Testimony and Dashboard Camera Video

The United States called Trooper Justin Coda to testify about the traffic stop that led to Wilburn's arrest on March 22, 2018.[6] On that date, Trooper Coda learned from the DEA about a vehicle they suspected was transporting heroin. (*Id.* at 61:3–10.) The DEA provided Trooper Coda with the make, model, color, license plate, and suspected occupants' names. (*Id.* at 61:14–17.) The DEA also provided the vehicle's point of origin, Detroit, and periodic updates on its location and estimated time of arrival at Trooper Coda's post at mile marker 3 on the Pennsylvania Turnpike.[7] (*Id.* at 61:14–25.)

---

[5] Neither the United States nor Wilburn presented evidence at the suppression hearing showing exactly what the DEA seized during their execution of the Webster Ave. Warrant. The only reference to the DEA's haul from the apartment—three grams of heroin, 148 grams of Quinine, and a Ruger High-Point 9mm pistol—appears in Wilburn's Proposed Findings of Fact and Conclusions of Law. (ECF No. 86, at 49.)

[6] Trooper Coda testified that he has served as a Pennsylvania State Trooper for 12 years. For the past seven years, Coda has been assigned to the "Shield Unit," which is a specialty highway interdiction team. As part of that specialized service, Trooper Coda received training on how to identify concealed compartments inside vehicles that could contain narcotics or firearms. And Trooper Coda testified that he has been involved in hundreds of traffic stops throughout his time in the Shield Unit. (ECF No. 85, at 59:11–60:25.)

[7] Mile marker 3 sits just east of the Pennsylvania-Ohio border. (*Id.* at 62:3–6.)

Eventually the target vehicle—a Toyota Rav4—reached Trooper Coda's location. (*Id.* at 62:10–22.) After the vehicle passed, Trooper Coda pulled onto the highway from his roadside location and followed the Rav4. That is when Trooper Coda saw the vehicle swerve several times inside its lane and travel over the right fog line multiple times. (*Id.* at 62:10–22; 81:1–9.) Although he witnessed what he believed to be traffic violations, Trooper Coda did not immediately activate his emergency lights. (*Id.* at 62:20–22.) He waited because the section of highway where he observed the alleged traffic violation had a guardrail, and Trooper Coda's policy was to avoid making stops near guardrails when he anticipated searching the vehicle. (*Id.* at 62:23–63:5.)

Trooper Coda's vehicle was equipped with a video recording device—commonly called a dashboard camera or "dashcam." (*Id.* at 63:22–24.) And Trooper Coda reviewed the footage from that dashboard camera in preparation for the suppression hearing. (*Id.* at 63:25–64:1.) Trooper Coda explained that the dashboard camera begins recording when he activates his emergency lights, and also tracks back to include video from the 45 seconds before he activated his lights. (*Id.* at 65:1–10.) Because he followed the target vehicle for about three miles before activating his lights, Trooper Coda explained that the dashboard camera did not capture when the vehicle swerved inside its lane and over the right fog line. (*Id.*)

On cross-examination, defense counsel played the dashboard camera recording—which the Court admitted into the record. (Gov't Ex. 1.) The video, which runs about thirty-seven (37) minutes, begins with the Rav4 traveling in the right-hand lane on the Pennsylvania Turnpike. (*Id.* at 0:00–0:46.) Once Trooper Coda activated his emergency lights, the video shows the Rav4's brake lights activate as the vehicle pulled over to the side of the Turnpike. (*Id.* at 0:46.) Trooper Coda pulled his vehicle behind the Rav4, exited his vehicle, then approached the Rav4 on the passenger's side. (*Id.* at 1:58.)

10

Although it was windy at times during the video, Trooper Coda's audio recording device—located on his shoulder—clearly captured his interaction with the Rav4's occupants. Inside the Rav4, Trooper Coda could see two individuals—a man in the driver's seat and another man in the passenger's seat. Trooper Coda would eventually identify the passenger as Wilburn. Once he reached the passenger's side window, Trooper Coda asked the driver for his license and registration. (*Id.* at 2:08–3:40.) He also asked where the men were "headed to." (*Id.*) The driver, who identified himself as Jonathan Dillon, stated that they had spent "a couple of days" in Detroit and were now headed to Pittsburgh. (*Id.* at 2:39–2:50.) Dillon also told Trooper Coda that the Rav4 belonged to his mother. (*Id.* at 2:30–2:40.)

When Trooper Coda asked if the men had a good time in Detroit, Dillon responded that they were there visiting Wilburn's family. (*Id.* at 2:45–3:00.) That is when Trooper Coda asked Wilburn for identification. (*Id.*) Wilburn reached to the back seat and retrieved his identification. (*Id.* at 2:54–3:06.) While Wilburn retrieved his identification, Trooper Coda asked how the men knew each other. (*Id.* at 3:04–3:08). Dillon responded that he and Wilburn were friends. (*Id.*)

A little over three minutes into the video, Trooper Coda told the men that he saw the Rav4 swerving. (*Id.* at 3:00–3:30.) He asked Dillon whether he had been "falling asleep"—something Dillon denied. (*Id.*) Instead, Dillon stated that he had been putting loose change from the recent toll booth transaction into his pocket, which caused him to swerve. (*Id.*) As Trooper Coda reviewed Wilburn's identification, he noticed that it was marked "void." (*Id.* at 3:39–3:44.) When Trooper Coda asked Wilburn about his identification, Wilburn confirmed he was from Detroit. (*Id.* at 3:40–3:45.) Trooper Coda told the men to "hang tight" and returned to his police vehicle. (*Id.* at 3:50–4:01.) The initial conversation between Trooper Coda and the two occupants of the Rav4 lasted less than two minutes.

At the suppression hearing, Wilburn's counsel extensively cross-examined Trooper Coda on his initial interaction with Dillon and Wilburn—the time from first contact to when Trooper Coda returned to his police vehicle. Trooper Coda testified that once he began speaking with Dillon, he did not suspect that Dillon was driving under the influence of drugs or alcohol. (ECF No. 85, at 82:7–8.) Trooper Coda did not conduct a breathalyzer or field sobriety test. (*Id.* at 82:12–17.) When questioned, Trooper Coda stated that he could see the whole front compartment of the Rav4 during the initial interaction. (*Id.* at 83:13–14.) He also testified that he could see in the back seat and trunk area of the Rav4.[8] (*Id.* at 83:15–24.) And he also testified that he did not see any drugs, firearms, or large sums of cash in the vehicle. (*Id.* at 85:16–23.)

Trooper Coda noted on direct examination that he found it suspicious that there was no luggage in the vehicle, despite Dillon and Wilburn's claim to have spent "a couple of days" in Detroit. (*Id.* at 68:4–21.) In Trooper Coda's view, two people on a multi-day, out-of-state trip would have "some type of duffel bag, [or] some type of clothing with them." (*Id.* at 68:10–18.) On direct examination, Trooper Coda drew on his experience as an interdiction officer, noting that often "with drug trafficking you'll notice that they have been up all night. They got in the car in the clothes they were in. They drove, and they came back. So the lack of luggage was inconsistent with the story that they gave me for their trip." (*Id.* at 68:13–18.) Thus, Trooper Coda emphasized the lack of luggage as a key indicator of suspicious activity. (*Id.* at 72:10–16.) On cross-examination, Trooper Coda acknowledged that Wilburn had a backpack (or some sort of bag) in the back seat, since that is where Wilburn retrieved his identification during the initial interaction. (*Id.* at 86:19–24.)

---

[8] Because the Rav4 is a hatchback-style vehicle, the "trunk" area is visible through the rear hatchback window. (ECF No. 85, at 83:22–24.) And the video appears to show Trooper Coda peering into the trunk as he approached the Rav4. (Gov't Ex. 1, at 1:59–2:03.)

Trooper Coda also testified about Dillon and Wilburn's demeanor throughout the traffic stop—including the initial two-minute interaction. (*Id.* at 69:7–21.) Both Wilburn and Dillon, according to Trooper Coda, appeared "extremely nervous throughout the entire traffic stop."[9] (*Id.*) Wilburn's nervousness, especially, drew Trooper Coda's interest, because, in Trooper Coda's view, a passenger usually has nothing to be nervous about during a traffic stop. (*Id.*)

In the video, Trooper Coda spent about 11 minutes in his police vehicle after returning from the initial interaction with Wilburn and Dillon. (Gov't Ex. 1, at 4:00–15:00.) Shortly after Trooper Coda returned to his vehicle, his partner—Trooper Marmol—joined him. (*Id.* at 4:00.) At this point, because the dashboard camera faces out the front of Trooper Coda's vehicle, both he and Trooper Marmol are off screen. But Trooper Coda's shoulder-mounted audio-recording device captured their conversation. Trooper Coda is heard telling Trooper Marmol that they "might as well just do a quick warning" for the traffic violation. (*Id.* at 5:35–5:45.) At the suppression hearing, Wilburn's counsel asked Trooper Coda what he meant by that statement. (ECF No. 85, at 88:4.) He responded: "That I might as well just do a warning for the violation, for the traffic violation." (*Id.* at 88:5–6.) From the time Trooper Coda returned to his police vehicle to when he told Trooper Marmol he planned to "do a quick warning," about two minutes passed. (Gov't Ex. 1, at 4:00–6:00.)

After he made his decision to issue a traffic warning, Trooper Coda spent another eight minutes in his vehicle before returning to the Rav4. In that time, Trooper Coda can be heard telling Trooper Marmol that he was "going to run this guy's RAP real quick"—referring to Wilburn or Dillon's criminal history. (*Id.* at 11:46–11:50.) At the suppression hearing, Trooper Coda testified

---

[9] On the dashboard camera video, Trooper Coda is heard remarking several times that either Dillon or Wilburn appeared "super nervous" during the initial conversation and was "shaking like crazy." (Gov't Ex. 1, at 4:10–4:30, 5:00–5:04.)

that he was referring to searching Wilburn and Dillon's names in CLEAN and NCIC—both criminal history databases. (ECF No. 85, at 87:11–18.) The audio recording picked up Troopers Coda and Marmol discussing the long criminal history report that came up when they ran the names—including drug convictions.[10] (Gov't Ex. 1, at 11:50–15:00.) In particular, Trooper Coda is also heard remarking that the passenger, Wilburn, "got arrested by the FBI for . . . conspiracy to distribute cocaine, possession with intent, possession with intent heroin and cocaine." (*Id.* at 14:06–14:26.) Trooper Coda then told Trooper Marmol that Wilburn also had multiple state-level drug arrests out of Detroit. (*Id.* at 14:35–14:50.) All this time, Trooper Coda testified that he was also preparing the traffic warning for Dillon. (ECF No. 85, at 89:12–90:2.)

After around 11 minutes back at his vehicle, Trooper Coda again approached the Rav4. (Gov't Ex. 1, at 15:20–16:50.) This time he asked Dillon to step out of the Rav4. (*Id.*) Before speaking with Dillon outside the Rav4, Trooper Coda returned Wilburn's license. (*Id.* at 15:46.) At the 16:44 minute mark, Trooper Coda handed Dillon a written warning for the traffic violation. (Gov't Ex. 1, at 16:25–16:56.)

But handing Dillon the written warning did not end the stop. Instead, Trooper Coda questioned Dillon and Wilburn separately. (*Id.* at 16:40–19:50.) Even after he issued the written warning, Trooper Coda testified that Wilburn and Dillon appeared nervous. (ECF No. 85, at 69:15–21.) It is during this post-warning questioning that Trooper Coda testified that he found inconsistencies between Wilburn and Dillon's stories. On direct examination, Trooper Coda stated that Dillon, the driver, said the purpose of the trip was to take Wilburn to see a doctor in Detroit. (*Id.* at 72:2–8; Gov't Ex. 1, at 17:38–17:45.) Wilburn, on the other hand, never mentioned seeing

---

[10] During his testimony at the suppression hearing, Trooper Coda watched and listened to the portion of the dashboard camera recording when he and Trooper Marmol discussed a particularly lengthy criminal history report that their search retrieved. But he could not remember whether he was reading Wilburn or Dillon's criminal history report during that portion of the video. (ECF No. 85, at 91:2–8.)

a doctor in Detroit. (ECF No. 85, at 72:9–16.) Instead, Wilburn told Trooper Coda that he and Dillon went to Detroit to see some friends. (*Id.*)

The dashboard camera recording included audio for all of Trooper Coda's post-warning questioning of Wilburn and Dillon. Aside from the inconsistency involving the doctor visit, Wilburn's and Dillon's stories mostly aligned. Both men stated that Dillon picked Wilburn up in Pittsburgh before they drove to Detroit. And both told Trooper Coda that they arrived in Detroit that Monday—four days before the traffic stop. Both told Trooper Coda that Wilburn was originally from Detroit but now lives in Pittsburgh. Likewise, both men stated that they met each other through mutual friends. (*Id.* at 16:50–17:08.) Finally, both noted that they visited with Wilburn's family while in Detroit. (*Id.* at 17:19–17:28.)

After speaking with both men separately for several minutes, Trooper Coda returned to Dillon and told him that his and Wilburn's stories did not match up. (*Id.* at 19:38–19:43.) Trooper Coda then asked Dillon whether there was anything illegal in the Rav4. (*Id.*) Dillon denied any contraband being in the vehicle. (*Id.*)

Trooper Coda then asked Dillon: "can I search the car?" To which Dillon responded: "yeah, I have no problem." (*Id.* at 19:43–19:50.) Trooper Coda confirmed that the vehicle belonged to Dillon's mother and that Dillon was allowed to drive the car. (*Id.* at 19:50–19:55.) And Trooper Coda then again confirmed that he could search the car, to which Dillon again agreed. (*Id.* at 19:55–19:58.)

Trooper Coda testified on direct examination that he felt he could have searched the vehicle even if Dillon had not given permission. (ECF No. 85, at 72:2–73:3.) Trooper Coda based that statement on four factors. First, the inconsistency between Wilburn and Dillon over the doctor appointment. (*Id.*) Second, the lack of luggage. (*Id.*) Third, that the origin and destination of Wilburn

and Dillon's trip were known as sources and destinations for heroin and fentanyl trafficking. (*Id.*) Fourth, the information provided by the DEA identifying the vehicle, occupants, and travel plan. (*Id.*)

Although it is not visible in the dashboard camera recording, Trooper Coda testified about what he saw once he began searching the Rav4. On direct examination, Trooper Coda testified that once inside the Rav4, he could tell that someone had tampered with the center console. (*Id.* at 71:13–20.) On cross-examination, Trooper Coda clarified that he did not see the bump in the center console until he looked in the driver's side, which occurred after he requested permission to search the vehicle. (*Id.* at 98:14–16.) Trooper Coda described the center console as "kinked" and that the plastic pop rivets "had clearly been taken off." (*Id.* at 71:13–20.) In his experience, drug traffickers can use the space inside the center console to hide contraband—though it is not necessarily common. (*Id.* at 72:20–23.) Once Trooper Coda pulled back the panel of the kinked center console, he could see inside the underpart of the gear shift. (*Id.* at 104:10–14.) In that space, Trooper Coda found a handgun and about a quarter kilogram of heroin. (*Id.*)

The dashboard camera recording shows Trooper Coda's search beginning 21:48 minutes into the video. The heroin discovery happens around the 24:12 minute mark and the handgun around the 36:30 mark. (Gov't Ex. 1, at 21:48–36:30.) Once they found the heroin, Troopers Coda and Marmol arrested Dillon and Wilburn.

## III.  <u>DISCUSSION</u>

As in other cases, the parties' briefs and oral arguments shape the Court's analysis of the merits of Wilburn's motion. In most cases, the Court can simply detail the parties' positions in the ordinary course of working through its analysis. But here, the United States' positions and its strategy which were the focus of its initial filings and in argument at the suppression hearing require more discussion than usual because they impact what arguments the Court will consider in

resolving the suppression motion. Specifically, the United States asks the Court to impute the DEA's "collective knowledge" to Trooper Coda to support the roadside seizure central to this case in an argument appearing for the first time in its post-hearing filings. Wilburn opposes the United States' request. As set out in detail below, the Court will not consider that argument, but will deny the suppression motion on other grounds.

The "collective knowledge" doctrine provides that the knowledge of some members of law enforcement may be imputed to others to support a finding of reasonable suspicion or probable cause. *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010). Here, the United States only in its post-hearing filings asked that the knowledge of the DEA agents on this case, especially Agent Laukaitis, be imputed to Trooper Coda to support his stop, seizure, and search of the Rav4. In opposing that argument, Wilburn asserts that the Court considering the "collective knowledge" doctrine now would both prejudice him and reward what he describes as inequitable conduct in the presentation of that argument by the United States. So before getting to the merits of Wilburn's suppression motion, the Court must address the effect of the United States' self-described "strategy" relative to and at the suppression hearing, the substance of which the Court concludes to have been unsupported by settled Circuit law and to have inequitably prejudiced Wilburn. In doing so, it is necessary for the Court to set out in some considerable detail the procedural and substantive arc of the briefing and proceedings relative to the suppression motion.

The United States' approach first appeared in its written response to Wilburn's suppression motion. Wilburn moved to suppress all of the evidence against him—mainly arguing that both search warrants lacked probable cause; Trooper Coda lacked reasonable suspicion to begin the traffic stop; and Trooper Coda impermissibly extended the roadside detention. (ECF No. 52.) While some nuances of his current arguments emerged only after the suppression hearing, driven

by the record then developed, the bulk of the arguments Wilburn makes now are the same as those raised in his extensive initial brief. (*Id.*)

The United States responded to Wilburn's detailed motion with a three-page filing that only lightly touched on the substantive Fourth Amendment issues Wilburn raised, instead citing to case law about the legality of the cell site warrant under the Supreme Court's *Carpenter* doctrine. (ECF No. 66.) In that filing, the United States also asserted that "the defendant has the preliminary burden at any hearing to *prove* his standing to challenge the searches." (*Id.* at 1 (emphasis added).) "Until he accomplishes this," the United States said, "no suppression hearing is warranted. Thus, the motions must be denied unless and until the defendant complies with his burden." (*Id.*) That statement by the United States, as the Court will explain, does not and did not accurately state the applicable law. And there was no mention of the "collective knowledge" doctrine to support the seizure and search of the Rav4, even though it would have then been available for the United States to then make, given that it would have been well aware from law enforcement of what had unfolded in its investigation of Mr. Wilburn.

Wilburn replied to the United States' somewhat modest initial filing by citing case law and recounting the arguments from his opening brief to show why a suppression hearing was warranted. (ECF No. 70.) The United States then filed a second pre-hearing response to Wilburn's motion. There, again, the United States claimed that "[a] review of the defendant's motions reveals that they are insufficiently [pled] and do not justify a suppression hearing." (ECF No. 71, at 1.) The United States then offered up what it described as a "very brief history" of Fourth Amendment "standing" to show why Wilburn was not entitled to a suppression hearing. (*Id.* at 2.). Again, there was no reference to the "collective knowledge" doctrine to support the seizure and search of the Rav4.

But there were a pair of noteworthy gaps in the United States' supplemental pre-hearing response: First, the United States' survey of applicable law did not cite the decisions from the Supreme Court and Third Circuit holding that Fourth Amendment standing is not a preliminary jurisdictional issue in determining a suppression motion or deciding whether to hold a suppression hearing in the first place, and that there is no obligation for a defendant to prove any such thing as a gateway issue or by witness testimony before the Court could or should consider substantive Fourth Amendment arguments. Second, at least for the traffic stop issue, Wilburn had unmistakably and properly asserted his Fourth Amendment "standing" in his opening brief. As the Court explains below, every occupant in a vehicle has a cognizable privacy interest to challenge the warrantless seizure of that vehicle. *See United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006). Wilburn stated in his opening brief that he was the passenger in the stopped Rav4, and the United States well knew that fact. (ECF No. 52, at 3–4.) So even if the United States was right (and it was not) that Wilburn more generally had to first "establish" Fourth Amendment standing as to the seizure of the Rav4 before earning a suppression hearing, Wilburn's opening briefs and critically the facts the United States already knew to be true did just that. After all, no one has *ever* contested that Wilburn was a passenger in the Rav4.[11]

As for the hearing itself, from the start, the United States argued that it did not have to move forward until Wilburn *proved* his standing to challenge the evidence against him and did so through

---

[11] In this regard, the United States seems to have hedged its bets. In its supplemental pre-hearing brief, the Government directly stated that in its estimation, "the defense has not met their burden and no hearing should be held on *any* of the searches." (ECF No. 71, at 2 (emphasis added).) In the next paragraph, it nonetheless acknowledged that any legitimate occupant of a vehicle can challenge a traffic stop, and went on to state "[a]s such, if the Court should somehow find that the defense has met their initial burden, the [G]overnment would then agree that a hearing regarding Defendant Wilburn's challenge to the validity of the stop should be held." (*Id.*) This equivocal concession by the United States did not expressly acknowledge what it had to know to be true—Wilburn was an occupant in the Rav4, and that there was no suggestion that his presence was not "legitimate." That means that there was no basis to call into question Wilburn's ability to challenge the stop of the Rav4 by Trooper Coda (and if the stop was impermissible, his effort to exclude the fruits of that traffic stop).

witness testimony. (ECF No. 85, at 15:12–16:11.) As the United States told the Court: "we believe it's strategically beneficial to the government for Defendant to have to meet that burden . . . . So we are choosing strategically to require the Defendant, *as the law requires him to do*, *before we even get into this thing*, for [the Defendant] to establish standing." (*Id.* at 15:24–16:11 (emphasis added).) In the United States' view, Wilburn should have had to place more facts on the record by witness testimony at the very start of the suppression hearing to establish Fourth Amendment standing, which the United States had contended was the ticket of admission for such a hearing in the first place. (*Id.* at 16:5–8.) As became plain, this "strategy" was not grounded in applicable law and appears to have had much to do with the Government trying to have Wilburn take the witness stand.

The Court observed on the record that Agent Laukaitis's Webster Ave. Warrant affidavit stated that Wilburn maintained the apartment "as his residence," and the cell phone location information confirmed he regularly spent the night there. (ECF No. 52-3, at 6.) These facts in Agent Laukaitis's sworn declaration alone would give Wilburn a sufficient cognizable interest to make a Fourth Amendment challenge to the Webster Ave. Warrant. *See Minnesota v. Olson*, 495 U.S. 91, 96–98 (1990). The Court observed that in its estimation, Agent Laukaitis's sworn declaration that Wilburn lived at the Webster Ave. apartment was good enough to proceed with the suppression hearing. After all, it was a substantial enough connection between Wilburn and the apartment for law enforcement to rely on it in seeking a warrant from a federal judge authorizing it to search exactly that place for evidence relative to Wilburn. And the Court said so at the hearing. (ECF No. 85, at 19:6–21.)

In response to the Court's observations, the United States persisted in and amplified its "standing first" and "witness testimony from the defendant is required" arguments, and vigorously insisted that, in its view, "standing is established through competent evidence . . . . *Somebody up*

*on that witness stand, presumably Mr. Wilburn, testifying* 'Yes, that's my cell phone' or 'I lived there.'"[12] (*Id.* at 17:8–12 (emphasis added).) The United States told the Court: "For obvious reasons, you can understand our strategic benefit of us wanting that evidence to be presented and being required to present that." (*Id.* at 17:13–15.)

In further response to the Court's follow-up inquiry into why Agent Laukaitis's sworn search warrant applications did not themselves establish Wilburn's standing to challenge the warrants, counsel for the United States said: "Cases make clear, standing the Defendant has to establish. I haven't seen a case where . . . standing has been established because a court has taken judicial notice of what's listed in an affidavit, *because that's not competent evidence presented at the suppression hearing*."[13] (*Id.* at 18:17–21 (emphasis added).) The United States then argued: "*I can't just rely on a document that's been submitted in an affidavit for competent evidence at a suppression hearing.*[14] *I have got to put on evidence, and that's what I'm prepared to do*, and that's what [the Defendant] should be prepared to do." (*Id.* at 18:22–19:1 (emphasis added).)

Those affidavits were sufficient for a court to proceed with a hearing on the merits of the suppression motion. Cases decided by other members of this Court before and since the suppression hearing say just that. This is also especially true since the United States has since

---

[12] This choice of a personal pronoun ("I") and personal possessive adjective ("my") by the United States would appear to confirm that it was Wilburn himself that the Government thought needed to take the witness stand.

[13] As noted below, at the time of the suppression hearing, there were at least two cases decided by other judges of this Court that held that search warrant affidavits would accomplish exactly that. In opposing the position of the United States, Wilburn cited the decision in *Steagald v. United States*, 451 U.S. 204, 210 (1981). In that case, the Court held that the United States had forfeited the ability to challenge the defendant's suppression arguments at the Supreme Court, seemingly on several grounds, including when it had "made contrary assertions in the courts below, when it had acquiesced in contrary findings in those courts, or when it has failed to raise such questions in a timely fashion during litigation." *Id.* at 209. In *Steagald,* the Court concluded that all three principles applied, including that "during the course of [those] proceedings the Government [had] directly sought to connect the petitioner with the house" which was the subject of the challenged search. *Id.* at 201. Given the multiple distinct but still related bases for the Court's conclusion in *Steagald*, it would appear to be instructive, but not conclusive, precedent.

[14] As will be seen below, the United States ultimately did decide to do that, that is rely on the Warrant affidavit.

changed its mind and now argues that the affidavits are more than good enough for the United States to rely on for the late-arriving "collective knowledge" argument that is a big part of its post-hearing submission.

When the Court turned back to Wilburn, defense counsel argued that "under [the United States'] approach, they can manufacture a standing issue and compel the Defendant's testimony at every suppression hearing." (*Id.* at 25:3–5.) The Court need not determine the breadth of the consequences of the Government's position if it were applied in all cases, but as noted above, in this case, the Government was not shy about expressing its goal of having Wilburn take the witness stand when neither the law nor the record required as much.

Eventually, when the Court asked how Wilburn wanted to proceed, defense counsel decided to call Agent Laukaitis to the stand. (*Id.* at 27:16–22.) But in that exchange, there was an important limiting principle to Wilburn's decision to call Agent Laukaitis to the stand:

> Defense Counsel: I mean, if Your Honor—I suppose I would call Special Agent Laukaitis on this issue.
>
> The Court: Okay. On standing? *As to standing only at this moment*?
>
> Defense Counsel: Yes.

(*Id.* (emphasis added).) Therefore, Wilburn's presentation of proof, and thus Agent Laukaitis's testimony when Wilburn called and questioned her as a witness, only extended to the issue of standing—the issue on which the United States was so focused. Given the United States' argument and defense counsel's answer to the Court's limiting question, that was the only issue defense counsel would have any motivation to interrogate about. And as a result, all of Agent Laukaitis's direct testimony related to Wilburn's "standing" to challenge the search warrants, just like the United States invited. For its part, the United States only asked Agent Laukaitis three questions after Wilburn called her to establish his Fourth Amendment standing. (*Id.* at 38:18–39:6.) None of those three questions,

nor any of Agent Laukaitis's other testimony, had anything to do with the traffic stop. Once again, there was still no mention from the United States of the "collective knowledge" doctrine to support the seizure and search of the Rav4, nor any effort to elicit testimony that would support it.

Because Wilburn was calling Agent Laukaitis to testify "as to standing only," Wilburn never questioned Agent Laukaitis on anything related to the traffic stop. Nor did Wilburn question Agent Laukaitis on her or the DEA's reasonable suspicion on the day of the traffic stop, which the United States belatedly asks the Court to impute onto Trooper Coda through the "collective knowledge" doctrine. (ECF No. 87, at 12–18; ECF No. 93, at 1–8.) But defense counsel had no reason to do any of that, given the limited purpose for which Wilburn called Agent Laukaitis to testify and the fact that the United States had said nothing about relying on Agent Laukaitis for anything related to the validity of the traffic stop, despite its filing two pre-hearing briefs in opposition to Wilburn's suppression motion. But even more importantly, the United States elected not to elicit testimony from Agent Laukaitis about the DEA's information on the day of the traffic stop to support that post-hearing theory. Not on cross-examination when Wilburn called her to the stand, and not by recalling her to the stand as part of its own presentation even though she was in the courtroom. In fact, the United States barely elicited any testimony from Agent Laukaitis at all.

All of this matters because the record establishes that defense counsel reasonably believed Agent Laukaitis would retake the stand later in the hearing to testify about more than just the Fourth Amendment standing issue. The Court knows this not only because Wilburn credibly asserts it in his post-hearing briefs, but more critically because at the hearing, after Agent Laukaitis stepped down from the witness stand, defense counsel asked the Court to direct that the United States sequester Agent Laukaitis during Trooper Coda's later testimony. (*Id.* at 58:5–25.) And defense counsel showed some notable surprise when the United States replied to the sequestration

request by saying "I don't believe we're going to need her testimony, Your Honor. As far as I understand, the only issue left with the trial is with regard to the stop. *Miss Laukaitis was not at the stop*." (*Id.* (emphasis added). Logically, defense counsel would not have asked for sequestration had she not believed that Agent Laukaitis was likely to retake the witness stand. And given that the United States disclaimed any connection between Agent Laukaitis and the traffic stop, there was no hint that her testimony or knowledge would become relevant to any matter related to that stop. Then, as part of his questioning of Agent Laukaitis, Wilburn introduced the Webster Ave. Warrant affidavit into the record. And the admission of the affidavit turned out to be a helpful turn of events for the United States when it submitted its post-hearing filings.[15]

As the hearing concluded, the Court asked whether any party wanted to file post-hearing briefs. Wilburn asked for permission to do so. (*Id.* at 110:20–22, 111:2.) This provoked a rather sharp objection from the United States, which argued that

> [t]here is no reason for a post-hearing transcript of this case. We have a video. It's clear as day there's consent. There is just no reason to have a post-trial brief. We should be moving forward this case to a quick disposition of the matter. I think if you review this video and see what is obvious, that there was consent here, we know that *Leon* applies; and there can be no suppression.

(*Id.* at 111:3–10.)

As these events unfolded, the United States still had not used the phrase "collective knowledge doctrine" or anything close to it in opposing suppression—*i.e.*, take everything the

---

[15] The way the affidavit entered the record makes a significant evidentiary difference, since when Wilburn offered the affidavit into evidence, he was really offering the statement of a party-opponent witness, Agent Laukaitis. Had the United States sought to do so, it would have been seeking to introduce, for the truth of the matters asserted, an out of court statement of its own witness, one who was sitting with counsel for the United States in the courtroom during the hearing. And the United States would have been offering an affidavit that it had told the Court should not be considered as being sufficient evidence on the standing issue the United States had itself raised. While hearsay evidence may be considered at a suppression hearing, when the witness who authored an out of court statement is sitting in the courtroom—as Agent Laukaitis was—it would have been both appropriate (and virtually certain) that the Court would insist that her testimony come in as a witness, not as an affiant.

DEA knew at the time of the traffic stop and attribute that knowledge to Trooper Coda—which now makes up a key element of its post-hearing justification for the traffic stop. (ECF No. 87, at 12–18; ECF No. 93, at 1–8.) Instead, *that* argument did not emerge until the United States filed its own post-hearing proposed findings of fact and conclusions of law; the very ones it so strongly objected to anyone filing when Wilburn made the request for further briefing at the hearing. (ECF No. 87, at 13.)

Now that it seeks to impute Agent Laukaitis's and the DEA's knowledge onto Trooper Coda, the United States' decision to not call Agent Laukaitis as a witness to testify beyond the "standing" issue raises serious questions about the propriety of the Court imputing the DEA's knowledge to Trooper Coda as the United States requests. In the Court's judgment, doing so would effectively lead to a "bait and switch" on Wilburn, since defense counsel and the Court had made clear, in response to the United States' "standing comes first" argument, that Agent Laukaitis took the stand solely to testify on the standing issue. And it would impute all of Agent Laukaitis's knowledge to Trooper Coda using a legal doctrine the United States never raised until well after the hearing closed, having never risked Agent Laukaitis being cross-examined by Wilburn's counsel on those matters, and having filed two pre-hearing briefs and litigated the entire suppression hearing with no mention of it.

The United States offers a solution to get around any such concerns: it says that the Court should now consider everything in Agent Laukaitis's search warrant affidavit as facts in the record and impute all of that to Trooper Coda. The United States accurately observes that courts can consider hearsay evidence at a suppression hearing. *See United States v. Matlock*, 415 U.S. 164, 172 (1974) (but noting that admissibility does not necessarily mean the hearsay is entitled to significant weight). Yet the Court should not and will not overlook the reality that the United States took

completely contradictory positions between (a) its advocacy before and during the hearing and (b) in its written post-hearing filings. At the suppression hearing the United States argued, in response to the Court's observations about the content of the warrant affidavits, that Wilburn could not rely on those affidavits to establish his standing. The United States argued that live witness testimony, most preferably from Wilburn, was the *only* thing that would do the trick. But then in its post-hearing brief, the United States argued that *it* should be permitted to rely on the same affidavits to establish the DEA's overall "institutional" knowledge on the day of Trooper Coda's traffic stop, then impute all of that to Trooper Coda. For the reasons noted below, the Court is not going to do that.

That the United States advanced the "affidavits are not competent evidence" position at the suppression hearing in an attempt to get Wilburn to testify was and is readily apparent, since it said that it was strategically helpful for it to push to that goal. That effort did not work. But when it became time for the United States to meet its burden of justifying the traffic stop, the United States had no problem seeking to rely on those very affidavits to establish the DEA's reasonable suspicion and then imputing the affidavits' contents to Trooper Coda.

After Wilburn pushed back in his reply brief (ECF No. 90, at 1–4 & n.1), the United States suggested in its sur-reply that if the Court found any of Wilburn's concerns about the collective knowledge doctrine to be well founded, then the Court could reopen the suppression hearing to give the United States another shot at putting in more evidence. (ECF No. 93, at 8.) Notably, this is the hearing that the United States had appeared to treat as somewhat of a formality the first go around.

The trajectory of the United States' arguments is noteworthy. It first told the Court to deny Wilburn's suppression motion and his request for a suppression hearing because it said he had not established Fourth Amendment standing. But the United States also did not then reply to the substance of Wilburn's motion. Then, when Wilburn pushed back with applicable case law, the

United States filed a second pre-hearing brief that repeated the initial "no hearing needed" position without trying to distinguish the cases that undercut that position. Next, when the Court granted a hearing, the United States announced a strategy to force Wilburn to take the stand with arguments unsupported by then extant case law, arguing about Fourth Amendment standing instead of addressing the merits of the suppression motion.

As the hearing concluded, the United States argued that "[i]t's clear as day there's consent" to search the car but did not address the more complicated *Rodriguez* issue (which Wilburn had raised in his opening brief). (ECF No. 52, at 15–16; ECF No. 85, 111:3–10.) When Wilburn asked for post-hearing briefing, the United States objected again. It stated that in its view, "[w]e should be moving forward this case to a quick disposition of the matter." (*Id.*) Yet when it became clear in the post-hearing briefing that the *Rodriguez* issue could be tricky, the United States sought to avoid it by invoking a new legal theory never mentioned in its earlier briefs or at the hearing. Then, to close the loop, the United States told the Court that it could reopen the suppression hearing and give the United States another shot at proving the legality of the traffic stop.

In the midst of the suppression hearing, the Court had on the spot labelled the United States' strategy to require the defendant to establish standing as a preliminary matter "legitimate." (ECF No. 85, at 21:6.) Now, with the benefit of the parties' post-hearing filings, consideration of the case law that it has located, and reflection on what unfolded with regard to the litigation approach of the United States, that observation was simply incorrect—the "strategy" of the United States was inconsistent with Circuit law, and was both inequitable and unfairly prejudicial to Wilburn. Those results stemmed from the United States' non-stop efforts to use "Fourth Amendment standing" to force testimony from a criminal defendant at a suppression hearing, all while submitting multiple pre-hearing filings that told the Court little or nothing meaningful about the

United States' substantive arguments. Those arguments did not reference the precedential and persuasive cases that cut against its position, nor the "collective knowledge" principles that the United States belatedly advanced. That approach will not carry the day with the Court.

The reality is that the case law was clear and contrary to the position of the United States: unlike Article III standing, the law does not require that a court resolve Fourth Amendment standing as a threshold issue before conducting a suppression hearing. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (discussing standing on the second to last page of the opinion). In *Byrd*, the Supreme Court observed that the "concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Id.* But that is all that it is, in that "[b]ecause Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.*

And it is not just the Supreme Court's Opinion in *Byrd* that says Fourth Amendment standing is not a threshold issue that must be proven and resolved before any substantive suppression proceedings may occur. *See United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017) (Fourth Amendment standing "is not a jurisdictional requirement to pursue an argument."); *United States v. Kennedy*, 638 F.3d 159, 163 (3d Cir. 2011), *abrogated on other grounds by Byrd*, 138 S. Ct. at 1518 ("[S]tanding to challenge a search is not a threshold issue that must be decided before reaching the question of whether a search was or was not constitutional."); *Mosley*, 454 F.3d at 253 n.5 (quoting *United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994)) (noting that the concept of standing as such has not had a place in Fourth Amendment jurisprudence since the 1970s); *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 215–16 n.1 (3d Cir. 1998) (resolving substantive Fourth Amendment

issues first and concluding that because the Government had reasonable suspicion, no need for the Court to discuss Fourth Amendment "standing"); *see also United States v. Nagle*, 803 F.3d 167, 176 n.2 (3d Cir. 2015) (standing is a question of substantive Fourth Amendment doctrine); *United States v. Golson*, 743 F.3d 44, 55 & n.9 (3d Cir. 2014).

Now, this is not to say a defendant does not bear some obligation to show his cognizable privacy interest if a court is to suppress evidence; he does. *See United States v. Stearn*, 597 F.3d 540, 551 n.11 (3d Cir. 2010). Still, that does not mean he needs to prove it by his or anyone else's live witness testimony, or in any other specific fashion, before the United States makes its case to justify the searches at issue, particularly a warrantless search which it carries the burden of justifying. Nor does it mean that a defendant must meet his burden by taking the witness stand himself.[16] And as noted below, a defendant can satisfy his duty by pointing to matters that are otherwise already in the case record. As the case law extant when the United States made its arguments makes plain, "standing" is part and parcel of the substantive Fourth Amendment analysis, not a preliminary issue to be proven by the defendant before a hearing occurs. So when the United States claimed that Wilburn "has the preliminary burden at any hearing to prove his standing to challenge the searches," and that the Court should deny his hearing request until he ponied up testimonial evidence (preferably for the United States, *his* testimony) of his privacy interest, the United States missed the mark.[17]

_____

[16] While the Government repeatedly argued in its pre-hearing briefing and at the hearing for this "take the witness stand" level and mode of proof, it has cited no cases that impose that specific requirement. As noted below, the cases that the Court found instead cut in the opposite direction.

[17] The United States relies on the Supreme Court's decision in *United States v. Salvucci*, 448 U.S. 83, 95 (1980) in arguing that Wilburn had to prove his Fourth Amendment "standing" by his own testimony. That is not what the Court held in *Salvucci*. Instead, it overruled its prior decisions holding that in a case in which possession was an element of the offense, anyone with a possessory interest in the item seized could challenge the search, and instead required the person challenging the search to "establish" a legitimate expectation of privacy in the item seized or the location searched. *Id.* at 92. It did not impose a "take the witness stand under oath" requirement, nor a requirement that such matters be resolved before the suppression hearing can begin. (cont.)

But most critically, there is and never was any legitimate question that Wilburn had such cognizable interests, and the United States would have known that. It is settled law that as a passenger in the Rav4, Wilburn had a cognizable interest permitting him to challenge the traffic stop. *See Mosley*, 454 F.3d at 253 n.6. If that seizure turned out to be impermissible, then any evidence seized after the moment the seizure became impermissible would be subject to suppression. *Id.* And for all of the tumult on this point, in its second pre-hearing brief the United States seemed to rather equivocally concede that Wilburn could seek to challenge the traffic stop of the Rav4, which if unlawful would be a basis to suppress evidence seized from the Rav4. (ECF No. 71 at 2.) As Trooper Coda's testimony made plain, before Wilburn filed his suppression motion the Government would have known what had been learned from Trooper Coda's roadside encounter with the occupants of the Rav4—that they both told him that they had travelled together to and from Detroit from the Pittsburgh area. There is no basis for anyone to conclude that Wilburn's presence as a passenger in the Rav4 was anything but "legitimate" and the driver's statements to Trooper Coda raised no facts that would suggest that Wilburn was some sort of stranger sitting next to him, and in fact all of his statements were to the contrary. Thus, the United States' concession in its second pre-hearing filing that Wilburn might be able to challenge the validity of the traffic stop was simply an acknowledgement of what was already well known to be true.

---

The Government's substantial reliance on *United States v. Stearn*, 597 F. 3d 540 (3d Cir. 2010) does not do the trick either. In that case, the core issue was whether the defendant could base his claim for relief on the possessory rights of third parties, rather than on his own legal rights and interests, and the Court held that he could not. Wilburn has not sought suppression based on the rights of anyone else, but more particularly, *Stearn* does not stand for the position so vigorously argued by the United States, namely that the only way for Wilburn to make his "standing" showing was to personally take the witness stand. (ECF No. 71 at 7.) In *Stearn,* the Court held the opposite: that the trial court was not obligated to address and resolve "standing" issues before considering the merits of Fourth Amendment claims that had been raised, and had the discretion to address Fourth Amendment issues in any order. 597 F. 3d at 553. *Stearn* does not hold that a suppression hearing cannot proceed until a defendant punches a "standing" ticket by personally testifying under oath.

And Agent Laukaitis's Warrant application stating that federal law enforcement reliably believed that Wilburn lived at the Webster Ave. apartment was sufficient evidence for these purposes that he did live there, meaning that he had a cognizable privacy interest in the residence. *Accord Olson*, 495 U.S. at 96–98. Here's why.

The federal agents who obtained and then executed the search warrant that the Government sought and then relied upon told the issuing federal judge just that, and then backed it up with relevant facts sworn to under oath. (ECF No. 52-3.) The averments of fact in that Warrant application were detailed and specific on this point: that the Warrant was sought specifically to further the criminal investigation of Wilburn*, and that the confidential source that law enforcement was relying on (and asking the issuing judge to rely on) knew that Wilburn maintained the Webster Ave. location as both his residence and drug "stash" location and had personally been with Wilburn at that location. Further, Agent Laukaitis told the issuing judge that before Wilburn went to Detroit, the GPS "ping" on Wilburn*'s* phone revealed that the "majority of his time was spent at the TARGET LOCATION [the Webster Ave. apartment]. This would include late hours of the night and early morning when a person would normally be asleep and in their residence." (*Id.* at 6 (emphasis added).) The very facts the United States had and has relied on to support the Webster Ave. apartment search at issue, one specifically targeting Wilburn, are the same ones that also establish Wilburn's privacy interests so as to give him the ability to challenge that search. And all of that was known to the Government when it made each of its pre-hearing filings and its arguments at the suppression hearing.

That those facts are enough to provide Wilburn with the ability to challenge the search of the Webster Ave. apartment has been recognized in other cases in this Court. In *United States v. Penney*, No. 19-00008, 2020 WL 6048810, at *9 (W.D. Pa. Oct. 13, 2020), the Court concluded

that a defendant could meet his obligations by relying on evidence in the hands of the Government, specifically including "statements on the face of the warrant application and the affidavit in support[.]" *Id.* In *Penney*, the search warrant application had identified the defendant as the occupant of a specific residential address. Based on that, the Court held that the "government cannot both allege that [the defendant] had a significant enough connection to [an address] to justify the issuance of a search warrant and then later claim that [the defendant] doesn't have a reasonable expectation of privacy in the same location." *Id.*

Similarly, in *United States v. Ginyard*, No. 17-00254, 2019 WL 257937, at *5 (W.D. Pa. Jan. 18, 2019), decided *before* the suppression hearing and briefing in this case, the Court held that "a defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply 'point to specific evidence in the record which the government [has] presented and which establishe[s] his standing.'" *Id.* In *Ginyard*, the Court then held that the search warrant application and affidavit, which stated that the defendant was the "owner, occupant or possessor" of the involved premises, and included statements that the defendant had been an overnight guest there, were enough to allow the suppression motion to proceed. *Id.*

Along the same lines, more than a decade ago in *United States v. Denson*, No. 08-00365, 2010 WL 3949869, at *2 (W.D. Pa. Oct. 7, 2010), the United States contested the defendant's ability to seek to suppress evidence seized from his residence, one searched pursuant to a warrant. In rejecting that challenge by the Government, the Court stated: "[T]he affidavit of probable cause . . . in support of the application for a search warrant averred that the Allegheny County real estate website lists [the defendant] as the owner of the subject property. Although the Court agrees that it is the [d]efendant's initial burden to establish standing, the government should avoid taking a legal position at a suppression hearing that is contrary to the averments in the underlying affidavit of probable cause." *Id.*

Though he does not use the exact term in asserting his objection to the Court considering the United States' late-arriving collective knowledge doctrine argument, Wilburn essentially asks the Court to invoke the principles of the judicial estoppel doctrine. (ECF No. 90, at 1–4 & n.1; ECF No. 96, at 1–5.) While application of those principles in a criminal case is not clearly defined, the Third Circuit has said that the doctrine "seeks to prevent a party from playing fast and loose with courts by asserting contradictory positions." *United States v. Vastola*, 989 F.2d 1318, 1324 (3d Cir. 1993). Those principles seek to prevent a party from gaining a prejudicial advantage when its actions have had the effect of misleading the Court. *Ortlieb v. Hudson Bank*, 312 F. Supp. 2d 705, 712 (E.D. Pa. 2004). The application of those principles should be tailored to address the specific harm identified and should be no greater than necessary to adequately mitigate the damage caused by the conduct at issue. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F. 3d 314, 319–20 (3d Cir. 2003) (quoting *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F. 3d 773, 779–80 (3d Cir. 2001)).

These principles counsel a court to focus on whether it would be inequitable if the Court permitted a party to switch gears and reverse positions in the course of proceeding. Generally, application of that doctrine is justified when (1) a party has taken positions that are irreconcilably inconsistent; (2) the party has acted from bad faith, which in *this* context means that it had changed positions in a way that plays "fast and loose" with the Court; and (3) the Court tailors the remedy to address the harm specified and concludes that no lesser sanction would remedy the damage done. *Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 319. The Court concludes that these principles should apply here.

First, the changed positions of the United States as to the admissibility and applicability of the warrant affidavits represented a complete about face. The United States first argued that the Court could not consider the facts in Agent Laukaitis's affidavits when it might benefit Wilburn

(establishing the standing the United States argued he needed to prove), but now argues the Court should consider those very same affidavits when it benefits the United States (the collective knowledge doctrine). When it became helpful to the United States, and well before it announced that it would rely on the "collective knowledge" doctrine, its objection at the suppression hearing to considering the facts stated in Agent Laukaitis's affidavits evaporated. And it has since relied on those affidavits to support that newly announced "collective knowledge" argument. So, the United States' positions at the suppression hearing and in its post-hearing brief about the admissibility and applicability of the affidavits were plainly inconsistent.[18]

As for the second prong, the Court need not conclude that the United States had a malevolent heart in advancing its "strategy" to try and get Wilburn to take the witness stand. That is not what "bad faith" means here. It is sufficient that, as part of its "standing strategy," the United States advanced an argument that was contrary to settled law (and certainly at least since the Supreme Court's decision in *Byrd*, and the decisions of our Court of Appeals in *Jackson* and *Kennedy*), and then pulled out a brand-new argument *after* the hearing that relied on the Warrant affidavits it said were not good enough when Wilburn had first tried to use them to establish

---

[18] The United States has advanced another set of fundamentally inconsistent litigation positions: its positions relative to the import of the contents of the Warrant application for the Webster Ave. apartment. The litigation positions of the United States in that regard are also material and irreconcilably inconsistent. This is because when it was necessary to justify the issuance of a search warrant for the Webster Ave. apartment, federal law enforcement asserted that Wilburn resided there in Agent Laukaitis's sworn application for the Warrant. Yet the United States then completely switched gears in the suppression proceedings and asserted that it was an open question whether Wilburn did reside there, and that Wilburn had to present his live witness testimony that he did. That, too, is a positional about face that had the effect of causing defense counsel to put Agent Laukaitis on the witness stand for a limited purpose, and then being confronted after the fact with the Government's late-arriving "collective knowledge" argument reliant on that same affidavit.

Given the prior cases decided by other judges of this Court, the Government's broad statements to this Court that the search warrant affidavit was insufficient to meet whatever obligation Wilburn had to show his privacy interest in the Webster Ave. apartment were simply off the mark. The direct inconsistency between the Government telling a Magistrate Judge that it was confident (and that the issuing judge should have been confident) that Wilburn lived at the Webster Ave. apartment, and its contrary position at the suppression hearing that Wilburn's interest in that apartment was some sort of mystery is also the sort of "fast and loose" complete switching of positions that the judicial estoppel doctrine is meant to address.

standing. That reflected the "fast and loose" litigation approach that the judicial estoppel doctrine proscribes. And the fact that Wilburn offered the affidavits without objection at the end of his examination of Agent Laukaitis does not matter either. At that point, given the unerring focus of the United States on its "standing first" argument, coupled with the fact that Agent Laukaitis was called to the stand as to standing only, and despite two pre-hearing briefs from the United States that never hinted at the collective knowledge doctrine, the fair inference that the Court draws is that the United States' lack of objection was also part of its "strategy," one that would have included the defense offering the affidavits into the record, and the United States thereby avoiding exposing Agent Laukaitis to cross-examination as to any issue beyond standing.

This switching of gears by the United States as to the use of the affidavits, and in ignoring the facts about Wilburn's residency as advanced by federal law enforcement when it sought the Webster Ave. Warrant, all coupled with the pursuit of a strategy dependent on a position unsupported by—and actually contrary to—both precedential and persuasive case law more than meets the "fast and loose" test.[19]

---

[19] That the Court stated on the spot at the hearing that the United States' strategy was "legitimate" does not change this outcome. The United States had Agent Laukaitis sitting at the hearing, and it could have made the testimonial record it would later need to support the "collective knowledge" doctrine as to the traffic stop. Instead, it stated that it would not call her as a witness as to "the stop."

More than that, the reason that courts count on lawyers laying out *all* of the law on the positions they take, even if that case law goes against their argument, is because courts need to respond in the heat of the moment to legally grounded advocacy. That means that then and there was the expected time for the United States to have cited to the above-referenced Supreme Court and Circuit decisions that ran against its "prove standing first with witness testimony" argument, and to the persuasive *Ginyard* and *Denson* decisions in this Court, decisions that were contrary to the arguments it was advancing relative to the import of the Webster Ave. apartment Warrant affidavit and the necessity of live testimony from the Defendant.

The United States did not bring those cases or principles to the Court's attention and instead made arguments that were counter to them. As it enlisted the Court in pushing Wilburn to call a witness for an initial resolution of "standing," the United States had an obligation to advance arguments consistent with Circuit law and to provide the Court with the relevant case law that was both for and against its position. It did not, and the consequences of its approach are thus of its own making.

Accepting the United States' collective knowledge arguments now would unfairly prejudice Wilburn, who would be deprived of the opportunity to cross-examine the United States' witnesses on the collective knowledge issues. There simply was not a hint when Agent Laukaitis took (or left) the witness stand that the "collective knowledge" doctrine would be relied on by the United States, and no one raised an eyebrow when the Court confirmed that she was being called as to standing only.

Lastly, at this stage of the proceedings, there really is no fair and just way other than the Court *not* considering the United States' "collective knowledge" doctrine arguments to address the result of the United States' litigation maneuvers. As a result, the Court will not consider the United States' collective knowledge argument in this case.[20] Instead, the Court agrees with Wilburn's

---

[20] The Court will not reopen the hearing to provide the United States with another chance to address applying the "collective knowledge" doctrine with testimony that was available to it at the first hearing. The United States had an opportunity to call or recall Agent Laukaitis to the witness stand at the suppression hearing to generate the record that could support its collective knowledge doctrine arguments. Allowing a "redo" at this point would be inequitable given the approach the United States elected to take before and at the suppression hearing. And the Court's erroneous observation that the United States' "strategy" was "legitimate" does not alter that conclusion. *Accord United States v. Coward*, 296 F.3d 176, 182–83 (3d Cir. 2002). After all, Agent Laukaitis was present to testify on any relevant topic for which the United States wanted to recall her. It knew exactly what it was doing before and at the suppression hearing, had every chance to call Agent Laukaitis at that hearing, and proceeded apace according to its ungrounded "strategic" plan. The position that the Government is in is the consequence of the approach it took before and during the hearing.

Circuit precedent also holds that District Courts should be "extremely reluctant" to reopen a suppression hearing. *See id.* at 180; *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (citing *United States v. Blankenship*, 775 F.2d 735, 740–41 (6th Cir. 1985)). When the United States seeks to reopen a suppression hearing, it bears a heavy burden. *See Coward*, 296 F.3d at 180–81. The United States must provide an adequate explanation why it did not present the evidence in the initial hearing. *See id.* 180–83. What the United States advances on this point that it thought admitting the affidavits would be enough. (ECF No. 93, at 8.) To begin, the Court must again observe that the United States never mentioned the collective knowledge doctrine *at all* until it filed its post-hearing brief. So neither the Court, nor, more importantly, Wilburn would have known when the affidavits were admitted to the record that the United States intended to impute the entirety of the affidavits' contents onto Trooper Coda to justify both the initial traffic stop and the length of the roadside detention. (ECF No. 87.)

The United States tries to shift the responsibility for this state of affairs to Wilburn's counsel for failing to ask Agent Laukaitis questions about the DEA's reasonable suspicion that the United States seeks to impute to Trooper Coda. (ECF No. 93, at 2.) As the United States puts it, Agent Laukaitis was "available for questioning on all topics." (*Id.*)

There are two problems with that argument. First, the United States bears the burden of establishing reasonable suspicion for the traffic stop, not Wilburn. That means that Wilburn's counsel had no reason, incentive, or obligation to ask questions about reasonable suspicion for the traffic stop on direct examination of Agent Laukaitis, since that would just be doing the United States' work for it. When the United States asked Agent Laukaitis only three questions, all of which were about the cell phone subscriber names, Wilburn would not have had any reason (cont.)

assessment that it "should resolve the questions concerning the legality of the stop by reference to Trooper Coda's testimony alone." (ECF No. 96, at 14.)

But with that said, the dispute over standing and the derivative dispute over whether to apply the collective knowledge doctrine does not impact the Court's ultimate decision in this case. For the reasons noted below, the Court concludes that based on the information available to him personally during the stop, Trooper Coda possessed a reasonable suspicion to extend the traffic stop. Accordingly, the Court will not suppress evidence that Trooper Coda lawfully obtained.

\* \* \* \* \* \*

Turning to the merits of Wilburn's motion, the Court's discussion proceeds in two parts. First, the Court will address Wilburn's challenge to the Cell Site Location Information Warrant and Webster Ave. Warrant. Second, the Court will examine the traffic stop that led to Wilburn's arrest, and his claim that the stop violated his Fourth Amendment right to be free from unreasonable seizure. The Court's conclusion for each part is the same: the record before the Court does not require the suppression of evidence.

---

to press the reasonable suspicion issue nor to suspect that the "collective knowledge" argument was coming later on. And at the hearing, the United States affirmatively said that she was not "at the stop" and therefore would not testify beyond standing matters. This is especially germane since Wilburn both called Agent Laukaitis for the limited purpose of proving standing and reasonably believed the United States would recall Agent Laukaitis later in the hearing if it was going to use her knowledge for anything else.

Second, the United States did not announce its intent to rely on the collective knowledge doctrine until well after the hearing, even though it had filed two pre-hearing briefs without referring to it, and never so much as suggested its application during the hearing when Agent Laukaitis was present. It cannot properly fault Wilburn's counsel for not countering at the hearing an argument that the United States itself had not raised nor somehow foreshadowed in its presentation. And Wilburn's counsel asserts in reply to the United States' reference to reopening the hearing that she reasonably took the United States' decision not to ask Agent Laukaitis questions about the DEA's reasonable suspicion to be part of a strategy to limit cross-examination into the DEA's broader investigation in this case. (ECF No. 96, at 4.). While she may be correct as to that conclusion, it really does not matter, since there was nothing that had occurred that would have been any sort of tip off that the "collective knowledge" doctrine was going to be on the table.

In sum, the United States' explanation is insufficient to cause the Court to reopen the suppression hearing. It generated the state of affairs that exists in these regards, not Wilburn or the Court. Thus, the United States' request to reopen the suppression hearing (ECF No. 93, at 8) is denied.

### A. **The Warrants**

Wilburn's first challenge is to the lawfulness of the Cell Site Location Information Warrant and Webster Ave. Warrant. As for the Cell Site Location Information Warrant, the Court concludes that, even if the warrant lacked probable cause, the DEA's reliance on the warrant was objectively reasonable. As for the Webster Ave. Warrant, the supporting affidavit stated probable cause to justify the Magistrate Judge's issuance of the warrant. So neither of Wilburn's challenges require suppression of those warrants' fruit.

### 1. **Probable Cause**

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining the sufficiency of an officer's affidavit, a magistrate judge must consider whether the "totality-of-the-circumstances" set forth in the affidavit establish probable cause. *See Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). An exact formula for what adds up to probable cause escapes precise and all-encompassing definition. Instead, the Supreme Court has held that probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Id.* at 236.

A district judge owes appropriate deference when reviewing a magistrate judge's probable cause determination. *See id.* at 238. There simply needs to be a substantial basis in the affidavit to support the magistrate judge's decision to issue a warrant. *See id.* at 236. And in making the probable cause determination, the magistrate judge may rely on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (citation and quotation marks omitted). When the defendant challenges the probable cause determination, the defendant bears the burden of showing the magistrate judge lacked a

"substantial basis" to issue the warrant. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (noting the defendant's burden).

Our Court of Appeals has long held that "[a] magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." *Stearn*, 597 F.3d at 555. An informant's "veracity" and "reliability" are factors for the magistrate judge to consider when conducting the probable cause inquiry. *See id.* (citing *Gates*, 462 U.S. at 230). In *Gates*, the Supreme Court set aside a rigid analysis of these two (2) factors. Instead, the Court held that "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233. *Gates* noted independent police corroboration of an informant's tip as a touchstone method for establishing the informant's reliability. *Stearn*, 597 F.3d at 555 (quoting *Gates*, 462 U.S. at 241).

When the alleged offense involves drug trafficking, evidence of past drug trafficking and association with known drug dealers is relevant to the probable cause analysis—though the probative weight is relatively low. *See id.* at 566. But when the officer provides facts that corroborate the confidential source's information, the magistrate judge can rightfully assign greater weight to the confidential source. *See id.*

### 2. <u>**Good Faith Exception**</u>

The exclusionary rule is not a tool to deter mistaken magistrate judges. *See Davis v. United States*, 564 U.S. 229, 238–39 (2011). When a magistrate judge issues a warrant later held invalid, the "error in such a case rests with the issuing magistrate, not the police officer." *Id.* Instead, the exclusionary rule applies only when it will "appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc) (citing

*United States v. Leon*, 468 U.S. 897, 909, 918 (1984)). So "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Put another way, exclusion is not synonymous with finding a violation of the Fourth Amendment. *See Katzin*, 769 F.3d at 170 (citing *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006)).

In *United States v. Leon*, the Supreme Court held that when officers act under a warrant later found to lack probable cause, the exclusionary rule does not apply if the officers acted "in objectively reasonable reliance" on the later-invalidated warrant. 468 U.S. at 922. As our Court of Appeals later observed, "[a] warrant represents judicial authorization of a particular search or seizure, and it is thought that exclusion will not deter police from relying on an invalid warrant unless the police should reasonably have known that the warrant's issuance would be found unconstitutional." *Virgin Islands v. John*, 654 F.3d 412, 418 (3d Cir. 2011).

But the Third Circuit has also identified four exceptions that the Supreme Court carved into *Leon*'s holding: First, when the magistrate judge issued the warrant relying on a deliberately or recklessly false affidavit. Second, when the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function. Third, when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Or, fourth, when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. *Id.* (citing *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010)).

When any of the above four circumstances are present, the officer's reliance on the defective warrant is not objectively reasonable. *See United States v. Franz*, 772 F.3d 134, 145–46,

146 n.11 (3d Cir. 2014). And in determining whether *Leon*'s good faith rule applies, the Court should consider the totality of the circumstances. *See id.* at 147. Thus, the Court should consider "not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known." *Id.* After all, it is the officer's culpability that would drive the suppression of evidence gathered in the execution of a defective warrant. *See id.* at 148–49.

### 3.   The Cell Site Location Information Warrant

Whether Agent Laukaitis's affidavit for the Cell Site Location Information Warrant lacked probable cause is a close call. It is not a close call, however, for the Court to conclude that Agent Laukaitis's reliance on the Cell Site Location Information Warrant was objectively reasonable. For that reason, *Leon*'s good faith exception still applies, and the Court will not suppress evidence obtained in the execution of the Cell Site Location Information Warrant.

In her affidavit (ECF No. 52-1), Agent Laukaitis provided the Magistrate Judge with essentially three central (3) bases for suspecting Wilburn of unlawful activity. First, and most important, was the confidential source's claim that Wilburn was involved in heroin trafficking. Second was the DEA's analysis of the toll records for the Sprint cell phone that the DEA believed Wilburn possessed. Third was investigative records from law enforcement and Wilburn's criminal history, which involved multiple drug charges. (*Id.* at 4–7.)

As Wilburn notes, there is nothing inherently unlawful gleaned from the toll records analysis. And he adds that criminal history, standing alone, does not necessarily suggest ongoing criminal conduct. What is left is the confidential source information. Because the confidential source provided the information on Wilburn in exchange for "judicial consideration for pending recent drug charges," Wilburn argues the confidential source is not credible. Although the affidavit

states that the confidential source "has been considered a reliable source of information by law enforcement," Agent Laukaitis did not explain the basis for that statement in her affidavit. (*Id.* at 6–7.). The affidavit did, however, contain information that the telephone toll records Agent Laukaitis examined showed telephone call traffic with cell phones in Michigan and West Virginia, which aligned with the information provided by the confidential source. The affidavit also set forth information about Wilburn's extensive record of drug-related criminal convictions in Michigan, specifically heroin distribution.

The question is whether, taken together, all of that information amounts to probable cause to support the issuance of a warrant. On the face of the Cell Site Location Information Warrant affidavit, that is a closer call. In particular, the failure to include more detailed information that the Magistrate Judge could properly rely on to conclude that the confidential informant was reliable gives the Court some pause. But even if there is not probable cause on that basis, Agent Laukaitis acted in objectively reasonable reliance on the warrant. So *Leon* forecloses Wilburn's argument that the Court must suppress the fruits of this search. Here is why.

In considering whether there is good faith reliance, the Court considers not only the warrant itself, but also the officer's conduct in obtaining and executing the warrant—*i.e.*, the totality of the circumstances. *See Franz*, 772 F.3d at 147. And here, none of the exceptions to *Leon* apply. The only one that Wilburn truly argues for is that the warrant depended on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. But as the Court already explained, while the probable cause decision is a closer call were this Court considering the question in the first instance, in the Court's judgment, the warrant and the application supporting it do not facially miss the *Leon* "good faith reliance" mark when all the information in the affidavit is considered, particularly the connections with Michigan and West Virginia from the

toll records, the statements of the confidential source, and the location of Wilburn's heroin selling convictions. So Agent Laukaitis would be reasonable to believe that her toll records analysis and use of the confidential information coupled with what she presented about the investigative activity and Wilburn's specific criminal history of drug trafficking convictions in Michigan were not so "lacking in indicia" of probable cause that the Magistrate Judge was facially mistaken to issue the warrant.

In sum, there is nothing in the record about the Magistrate Judge's determination, or on the face of the warrant, that should have alerted Agent Laukaitis that execution of the warrant was legally risky business. As such, the good faith exception applies in any event, and the Court will not suppress the fruits of the Cell Site Location Information Warrant.

### 4. **The Webster Ave. Warrant**

Whether there was probable cause for the Webster Ave. Warrant is not a close call. As the Court noted earlier, the Webster Ave. Warrant affidavit relied on much of the same information as the Cell Site Location Information Warrant affidavit. But the Webster Ave. Warrant affidavit benefitted from the added information gathered through the cell site location monitoring. As a result, the location monitoring corroborated significant parts of the confidential source and Detroit confidential source's information. That location information bolsters the two confidential sources' reliability.

In the end, Agent Laukaitis's Webster Ave. Warrant affidavit included: (1) the confidential source's personal observations of Wilburn involved in heroin distribution at the apartment; (2) the confidential source's information that Wilburn travelled to Detroit to pick up heroin; (3) the Detroit confidential source's tip that Wilburn trafficked heroin out of Detroit; (4) the cell site location information corroborating Wilburn's travel to Detroit; (5) DEA information connecting Wilburn's known associates to the Webster Ave. apartment; and (6) additional toll records analysis. (ECF

No. 52-3.) Looking at the totality of the circumstances, Agent Laukaitis's Webster Ave. Warrant affidavit provided probable cause to believe Wilburn was involved in heroin distribution involving that location. As a result, the Magistrate Judge had a substantial basis to issue the warrant.

For these reasons, Wilburn's challenges to the warrants are denied.[21]

## B. **The Traffic Stop**

Wilburn also challenges the legality of the traffic stop that led to his arrest and the discovery of heroin and a handgun. Because the Court concludes that Trooper Coda's conduct was consistent with the Fourth Amendment, the Court will deny Wilburn's motion.

When a defendant moves to suppress evidence, he has the initial burden of establishing a basis for his motion. *See Johnson*, 63 F.3d at 245. The usual starting point is to determine whether the seizure occurred without a warrant. When the defendant asserts that the government seized him without a warrant, he easily clears his modest initial burden. *See id.* The burden then shifts to the government to prove by a preponderance of the evidence that the officer's seizure of the defendant reflected the protections of the Fourth Amendment. *See id.*; *see also United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (noting the preponderance standard).

Here, no one disputes that Trooper Coda pulled Wilburn over and detained him without a warrant. So Wilburn easily establishes a basis for his motion. The burden then shifts to the United States to prove by a preponderance of the evidence that Trooper Coda's traffic stop aligned with the guarantees of the Fourth Amendment.

With the burden now on the United States, there are two questions the Court must consider. First, the Court must ask whether there was a lawful basis to stop Wilburn's vehicle in the first

---

[21] Wilburn also challenges the DEA's use of an administrative subpoena to obtain toll records from Sprint Wireless. (ECF No. 86, at 56.) Wilburn, however, raises the issue for preservation purposes only, since *Smith v. Maryland* allows law enforcement to use administrative subpoenas to obtain toll records. 442 U.S. 735 (1979). The Court considers the issue preserved and denies Wilburn's challenge to the administrative subpoena.

place. Second, the Court must ask whether Trooper Coda impermissibly extended the traffic stop by continuing Wilburn's roadside detention beyond the time when tasks tied to the traffic infraction should have been complete. The flip side of the second question is to ask whether, during the traffic violation investigation, Trooper Coda developed reasonable suspicion that Wilburn was involved in drug trafficking that supported the stop's duration.

### 1. Reasonable Suspicion and Traffic Violations

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a "seizure" of every person in the vehicle and must comport with the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 255–59 (2007). And because a traffic stop is a seizure of every occupant of the vehicle, every occupant has standing to challenge the legality of the stop. *See Mosley*, 454 F.3d at 253 n.6 ("[A] Fourth Amendment seizure of every occupant of a vehicle occurs the moment that vehicle is pulled over by the police. The legality of the seizure depends upon the legality of the traffic stop.").

The applicable standard for judging the lawfulness of a traffic stop is reasonable suspicion. *United States v. Delfin-Colina*, 464 F.3d 392, 396–97 (3d Cir. 2006). Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The standard requires that the officer have "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Put another way, the officer must have "a particularized and objective basis for suspecting the particular person stopped" of breaking the law. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette*, 572 U.S. at 396). Reasonable suspicion also depends on both the "information possessed by police and its degree of

reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

An officer's subjective reason for making a traffic stop plays no role in the reasonable suspicion analysis. *See Whren v. United States*, 517 U.S. 806 (1996); *United States v. Yusuf*, Nos. 19-3472, 19-3697/3800, 2021 WL 1232080, at *11 n.12 (3d Cir. Apr. 2, 2021). So pretext for a traffic stop is irrelevant to a court deciding a motion to suppress. Instead, "the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *Mosley*, 454 F.3d at 252.

Trooper Coda testified that he pulled Wilburn and Dillon over for violating 75 Pa. Cons. Stat. § 3309(1).[22] (ECF No. 85, at 94:1.) That statute provides: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." 75 Pa. Cons. Stat. § 3309(1).

Trooper Coda also credibly testified that he saw the Rav4 swerving within its lane then crossing over the fog line multiple times. (ECF No. 85, at 81:6–9.) This swerving went on for "a couple hundred yards." (*Id.* at 80:25.) Though he could not testify to the exact number, Trooper Coda stated that he saw the Rav4 cross the fog line more than twice. (*Id.* at 81:3–4.) As Trooper Coda put it, the Rav4 "was all over the place." (*Id.* at 81:8.)

Wilburn argues that Trooper Coda's observations do not support a violation of § 3309(1), so there was no reasonable suspicion of a traffic infraction. Wilburn relies primarily on *Commonwealth v. Gleason*, where a state trooper pulled over a vehicle after observing it "cross[] the berm line by six to eight inches on two occasions for a period of a second or two over a distance of approximately one quarter of a mile." 785 A.2d 983 (Pa. 2001), *superseded by statute*, 75 Pa. Cons. Stat. Ann.

---

[22] Wilburn also argues that the traffic violation was pretext to investigate drug activity, and that pretext makes the stop unlawful. (ECF No. 86, at 9.) But he concedes that *Whren* forecloses that argument and notes the objection for preservation purposes only. In the Court's estimation, Wilburn has preserved the issue.

§ 6308(b), *as recognized in Commonwealth v. Holmes*, 14 A.2d 1 (Pa. 2011) (explaining that after the Supreme Court of Pennsylvania, in *Gleason*, held that "the *statutory* standard for stops based on potential Vehicle Code violations was probable cause . . . . The legislature [ ]modified § 6308(b), bringing it in line with requirements of constitutional case law for stops not involving the Vehicle Code," *i.e.*, a reasonable suspicion standard (emphasis in original)). In *Gleason*, once the trooper approached the vehicle, he found the driver intoxicated. *Id*. During his DUI prosecution, the driver challenged the stop on grounds that his driving did not violate § 3309(1), and therefore did not give the trooper a basis to pull him over. The Pennsylvania Supreme Court agreed, holding that crossing the fog line twice by a few inches did not violate § 3309(1) when the officer had no reason to believe the driver posed a safety hazard. *See id.* at 989; *see also Commonwealth v. Garcia*, 859 A.2d 820 (Pa. Super. Ct. 2004) (officer did not have reasonable suspicion driver violated § 3309(1) when he witnessed driver's vehicle briefly veer over the fog line twice in response to oncoming traffic).

Wilburn argues that Trooper Coda's observations match those by the trooper in *Gleason*. But in the Court's estimation, Trooper Coda's testimony presents meaningful differences from *Gleason*. In *Gleason*, the trooper witnessed the vehicle cross the fog line twice, but only by a few inches. 785 A.2d at 983. Trooper Coda testified that he saw the Rav4 cross the fog line more than twice and did not say the incursion was only by a few inches. Critically, the trooper in *Gleason* did not witness the in-lane swerving that Trooper Coda observed in this case. That in-lane swerving colors how Trooper Coda could reasonably interpret the fog line crossing. While two tiny movements over the fog line might not present the sort of safety hazard *Gleason* said § 3309(1) captures, when the fog line crosses accompany in-lane swerving, it is reasonable to believe there is an on-going hazard. And it would also be reasonable to piece together the fog line crossing and in-lane swerving to suspect the driver may be intoxicated or texting. *See Commonwealth v. Lesane*, No. 1876-MDA-

2019, 2020 WL 3056099, at *1 (Pa. Super. Ct. June 8, 2020) (concluding, in circumstances nearly identical to this case, that in-lane swerving and crossing the fog line twice provided reasonable suspicion driver was intoxicated or texting).

Reasonable suspicion is not a high bar. Trooper Coda provided a particularized and objective basis for believing the Rav4's driver committed a traffic infraction—specifically, that he violated § 3309(1). For that reason, Trooper Coda's initial decision to pull over the Rav4 did not violate Wilburn's Fourth Amendment right to be free from unreasonable seizure. The Court must now determine whether Trooper Coda, once he stopped the Rav4 for a traffic infraction, unlawfully extended that lawful stop.

## 2.   The *Rodriguez* Moment

During a traffic stop, the Fourth Amendment allows officers to conduct an investigation unrelated to the reason for the stop, so long as that unrelated investigation does not lengthen the roadside detention. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009). If the unrelated investigation "measurably extend[s] the duration of the stop," then the seizure is unlawful unless the officer possesses another basis of reasonable suspicion or probable cause. *Id*. at 333. The lawful seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

*Rodriguez* provides the basis for Wilburn's traffic stop challenge. In *Rodriguez*, a police officer assigned to a K-9 unit stopped the defendant for unsafe driving. 575 U.S. at 351. After checking the defendant's license and registration, the officer returned to the defendant's vehicle to ask for the passenger's license and question the occupants about their travel plans. *Id*. The officer checked for outstanding warrants on the passenger but found none. *Id.* Despite this, the officer summoned backup.

48

*Id.* The officer then returned the defendant and passenger's identification and issued the driver a written warning—thus completing the traffic stop. Yet instead of allowing the defendant to drive away, the officer asked for consent to walk his K-9 dog around the vehicle. *Id.* at 352. The defendant declined, so the officer ordered him and the passenger out of the vehicle. Once backup arrived, the officer searched the car, and the K-9 dog alerted to the presence of drugs. *Id.*

The defendant argued that the officer's conduct conflicted with the Fourth Amendment. The Supreme Court agreed, holding that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. In the context of a dog sniff, the Supreme Court observed that the "critical question [is] whether conducting the sniff prolongs—*i.e.*, adds time to—the stop." *Id.* at 357 (internal quotation marks omitted). The Supreme Court also noted that an officer's "mission" during a traffic stop includes determining "whether to issue a traffic ticket" and making "ordinary inquiries incident to [the traffic] stop." *Id.* at 355 (internal quotation marks omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). And a dog sniff to "detect[] evidence of ordinary criminal wrongdoing" completely unrelated to the alleged traffic violation "is not fairly characterized as part of the officer's traffic mission." *Id.* at 355–56 (internal citation, quotation marks, and alteration omitted).

The Third Circuit has issued four precedential decisions interpreting *Rodriguez*—two from around the time of Wilburn's arrest and two released during the pendency of Wilburn's suppression motion. Here is what they say.

In *United States v. Clark*, the Third Circuit held that an officer unlawfully extended a traffic stop by unreasonably questioning the driver about his criminal history after tasks tied to the mission of the traffic stop "reasonably should have been[] completed." 902 F.3d 404 (3d Cir. 2018) (internal citation omitted). While the criminal history questioning lasted only 20 seconds, the Third

Circuit stated that brevity does not control whether an officer's questions were "off-mission." *See id.* at 410 & n.4.

The same year it decided *Clark*, the Third Circuit also decided *United States v. Green*, 897 F.3d 173 (3d Cir. 2018). There, our Court of Appeals observed that "the *Rodriguez* rule is far easier to articulate than to apply." *Id.* at 179. That is because "pinpointing" the so-called "*Rodriguez* moment"—the moment when tasks tied to the traffic stop are completed or reasonably should have been completed—is more art than science. *See id.* The Third Circuit acknowledged that the *Rodriguez* moment possibly occurs once the officer stops conducting tasks tied to the traffic stop even though the officer reasonably could have continued with those on-mission tasks. *See id.* at 182 (citing *Rodriguez*, 575 U.S. at 355). *Green* also suggested that, in appropriate cases, district courts might sidestep the difficult task of pinpointing the actual *Rodriguez* moment by simply assuming the defendant's proposed earliest potential *Rodriguez* moment. *See id.* at 179. There, the Court of Appeals concluded that the earliest the *Rodriguez* moment potentially occurred was when the officer pursued an off-mission task by making a radio call related to drug trafficking and was "no longer concerned with the moving violation." *Id.* at 182.

In *Green*, even when the Court assumed the earlier *Rodriguez* moment, it still held that the defendant's seizure was lawful because the officer possessed reasonable suspicion of illegal activity when the *Rodriguez* moment arrived. *Id.* Importantly, the defendant's claim that the traffic infraction was merely a pretext to stop his vehicle did not alter the Third Circuit's application of *Rodriguez*. *See id.* at 178 n.3, 181–87.

While Wilburn's motion was before this Court, the Third Circuit decided two additional *Rodriguez*-related decisions; the first being *United States v. Garner*. 961 F.3d at 264. There, an officer pulled over a speeding vehicle. *Id.* at 269. Before making the stop, the officer ran a license

plate check on the vehicle and learned that it was a rental car. *Id.* at 267–68. As the officer approached the vehicle, he could see the driver and a passenger in the front seats. And he noticed that the bar code sticker commonly found on rental car windshields was missing. *Id.* The officer also smelled a strong air freshener odor coming from the vehicle and saw air fresheners clipped on every vent. *Id.* During his initial conversation with the driver, the officer learned that the two men were "traveling along I-81 between New York City and Hagerstown, which [the officer] knew to be a drug trafficking corridor." *Id.* at 272. The officer also learned that the rental agreement for the vehicle had expired. *Id.* Then, before returning to his vehicle to run the driver's license, the officer asked "a series of questions about [the driver's] employment, prior traffic tickets, and criminal history." *Id.* at 268. The officer then continued the roadside detention, asking additional questions before eventually seeking consent to search the vehicle. *Id.* at 268–69. The driver declined, so the officer called in a K-9 unit, which uncovered cocaine and heroin in the vehicle's trunk. *Id.*

The Third Circuit upheld the legality of the defendant's seizure in *Garner*. In doing so, the Court noted that checking the driver's license, searching for outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance were "tasks ordinarily . . . tied to the mission of a traffic stop." *Id.* at 271 (citing *Rodriguez*, 575 U.S. at 355). The Court also reminded that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop." *Id.* (first citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); then citing *Clark*, 902 F.3d at 410). The Court then "conclude[d] that the earliest the *Rodriguez* moment occurred was when [the officer] began asking [the driver] about his employment, family, criminal history, and other conduct unrelated to the traffic stop." *Id.*

The Third Circuit held that the officer did not unlawfully extend the stop, because his aggregate knowledge at the *Rodriguez* moment amounted to reasonable suspicion. *See id.* at 271–72.

In particular, the Court of Appeals held that (1) the missing windshield sticker; (2) the air fresheners attached to every vent; (3) travel on I-81, a known drug corridor; (4) the expired rental agreement; and (5) extreme nervousness on the part of the driver, considered together, were "sufficient to show that [the officer's] suspicion of illegal activity was objectively reasonable." *Id.* at 272. So, as the Third Circuit put it, "no unlawful extension of the traffic stop ever occurred." *Id.* at 271.

Around the same time that it decided *Garner*, the Third Circuit also decided *United States v. Wilson.* 960 F.3d at 136. There, an officer pulled over a vehicle for tailgating and changing lanes without signaling. *Id.* at 145. Like most cases involving *Rodriguez*, the traffic stop ended with the defendant arrested for some non-traffic offense. *See id.* at 144–46. But unlike *Garner* and *Green*, the Third Circuit did not pinpoint the precise *Rodriguez* moment in *Wilson*. Instead, the Court concluded that "[w]ithin minutes, [the officer] learned suspicious facts that gave him cause to investigate further." *Id.* at 145. Consistent with *Green*, however, the defendant's argument that the traffic stop was pretextual did not impact the Court's *Rodriguez* application *See id.* at 144–46 ("pretext is irrelevant" when asking whether the officer had reasonable suspicion to extend the stop beyond the traffic infraction).

In *Wilson*, the officer called into dispatch for a license check, but because he already developed reasonable suspicion, the Third Circuit concluded there was no need to wait for the results from dispatch before investigating non-traffic crimes.[23] *See id.* at 145–46. The Third Circuit

---

[23] Wilburn suggests that *Wilson* is in tension with *Green*. In *Green*, the Third Circuit concluded that an officer waiting for backup to arrive usually does not measurably prolong a traffic stop. Yet the Third Circuit also noted that when the officer summons backup but does not wait for backup to arrive before proceeding with the investigation, the *Rodriguez* inquiry is much more complicated. 897 F.3d at 182 (citing *Rodriguez*, 575 U.S. at 355). As the Third Circuit later wrote of the *Green* decision: "We . . . recognized the possibility that the *Rodriguez* moment occurs when an officer no longer pursues the tasks tied to the traffic stop even though he reasonably could have continued with those tasks." *Garner*, 961 F.3d at 270 (citing *Green*, 897 F.3d at 182). *Wilson*, on the other hand, appears to place substantial importance on the fact that the license check was not complete by the time the officer decided to investigate non-traffic crimes. *See* 960 F.3d at 146 ("As [the officer] had not heard back from dispatch with information about [the defendant] and the rental car, the stop was still justified for traffic enforcement."). Yet it is not entirely clear that *Wilson*'s reasoning perfectly aligns with *Green*'s warning that an officer can impermissibly extend a traffic stop even though there are still tasks (cont.)

pointed to four facts that provided reasonable suspicion of drug trafficking. First, the defendants were driving through North Carolina in a rental car they picked up the day before in Philadelphia, but the person named in the rental agreement was not in the car. *Id.* at 146. Second, the defendants claimed they were heading to Georgia for a week, yet the car was rented for a month, and they had no luggage. *Id.* Third, when questioned by the officer about the reason for their trip, the defendants gave conflicting stories. *Id.* And finally, one of the defendants admitted having $20,000 in cash in the rental car. *Id.* The Third Circuit, noting the officer's extensive experience interdicting drugs, held that his suspicion was objectively reasonable; thus, the officer lawfully shifted from investigating the traffic violation to investigating other illegal activity. *See id.*

Taken together, *Rodriguez* and its progeny provide the Court with a few important guideposts for determining the lawfulness of Trooper Coda's traffic stop. First, *Rodriguez* clarified that the duration of a stop is circumscribed by the reason for the stop. Second, the best practice is for the Court to identify the *Rodriguez* moment—though because that is a tricky task, the Court can assume the earliest possible *Rodriguez* moment then work from there. Third, asking a passenger for his identification is typically not an off-mission task during a traffic stop. Neither is asking the vehicle's occupants about their travel plans. Fourth, pretext for the stop does not alter the *Rodriguez* inquiry. Finally, the Court's focus must be on whether off-mission questioning added time to the traffic stop, regardless of the brevity of that added questioning.

In Wilburn's case, the Court must first work its way forward through Trooper Coda's actions during the stop until it identifies the *Rodriguez* moment. Once it pinpoints the *Rodriguez* moment, the Court will work backwards to ask what Trooper Coda knew when he arrived at that

---

related to the traffic violation that need completing. The answer to this tension, as Wilburn points out, might simply be that the defendants in *Wilson* did not raise the issue during their appeal. In any event, since one Court of Appeals panel may not overrule a precedential opinion of another panel, *see Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017), this Court has to do its best to treat each as applicable precedent and harmonize their principles here.

point, and whether that knowledge amounted to reasonable suspicion to justify extending the seizure. For the first part of its inquiry, the Court concludes that the earliest the *Rodriguez* moment occurred here was when Trooper Coda began running the criminal history search once he returned to his vehicle after his first interaction with Wilburn and Dillon. By that point, Trooper Coda possessed specific and articulable facts to suspect Wilburn of drug trafficking. And up until that point, as the Court will explain, all of Trooper Coda's actions were on-mission. So the Court will assume that to be the earliest *Rodriguez* moment, since a later moment could not change the analysis.

Before working its way through Trooper Coda's questioning up until the *Rodriguez* moment, there is an initial matter the Court must address. In his brief, Wilburn argues that Trooper Coda immediately went off-mission when he began speaking with Dillon. (ECF No. 86, at 15–22.) Wilburn bases this argument on his claim that the traffic infraction was pretext to allow Trooper Coda to investigate drug activity. (*Id.*) And because the traffic stop was pretextual, Wilburn says, the Court should treat *all* of Trooper Coda's questions to Wilburn and Dillon as being about drug activity, not the traffic infraction that justified the stop. (*Id.*) But the import of the Third Circuit's decision in *Green* is that pretext for the stop does not alter the Court's application of *Rodriguez*. In *Green*, it was clear as day that the stop was pretextual. *See* 897 F.3d at 178 n.3. The Third Circuit still applied *Rodriguez* by asking whether the officer "divert[ed] from [the] stop's traffic-based purpose to investigate other crimes." *Id.* at 179 (citing *Rodriguez*, 575 U.S. at 354). Answering that question, the Third Circuit concluded the *Rodriguez* moment did not occur immediately, but rather *after* the officer's initial conversation with the driver. So the Court cannot accept the argument that Trooper Coda immediately went off-mission when he began speaking to Wilburn and Dillon.

With that matter resolved, the Court will examine Trooper Coda's conduct during the stop

until it reaches the moment when he measurably extended the roadside detention. In the dashboard camera video, Trooper Coda exits his vehicle and approaches the Rav4 on the passenger side. His first interaction was to ask Dillon, the driver, for license and registration. (Gov't Ex. 1, at 2:00–2:16.) There is no doubt those questions are tied to the purpose of the traffic stop. *See, e.g.*, *Rodriguez*, 575 U.S. at 355. So far, so good.

Trooper Coda then asked Dillon and Wilburn about their travel plans. (Gov't Ex. 1, at 2:16–2:28.) On the video, Dillon is heard telling Trooper Coda that him and Wilburn were headed from Detroit to Pittsburgh. (*Id.*) Because asking a few questions about travel plans ordinarily falls within the permissible scope of a traffic stop, this inquiry by Trooper Coda did not impermissibly extend the stop. *See Garner*, 961 F.3d at 271.

Next Trooper Coda asked who owned the Rav4. (Gov't Ex. 1, at 2:28–2:37.) Dillon responded that it was his mother's car. (*Id.*) This, too, was a question within the normal scope of a traffic stop. *See Garner*, 961 F.3d at 271–72 (officer inquired into the rental status of the stopped vehicle). Trooper Coda then asked how long Dillon and Wilburn were in Detroit, to which Dillon responded: "a couple of days." (Gov't Ex. 1, at 2:37–2:49.) Trooper Coda followed up by asking whether they had a good time in Detroit, and Dillon said they were there seeing Wilburn's family. (*Id.*) As with his earlier question about their destination, these questions by Trooper Coda fall into the sort of ordinary inquiry about travel plans that *Rodriguez* permits. So, to this point at least, Trooper Coda had not deviated from the traffic-related basis for the stop.

Trooper Coda then asked Wilburn, the passenger, for his identification. (Gov't Ex. 1, at 2:50–3:05.) Wilburn reached into the back seat and retrieved his identification from what Trooper Coda testified was a backpack or some sort of bag. (*Id.*; ECF No. 85, at 86:19–24.) As Wilburn retrieved his license from the back seat, Trooper Coda asked how Dillon and Wilburn knew each

other. (Gov't Ex. 1, at 3:05–3:08.) Dillon told Trooper Coda that he and Wilburn were friends.

(*Id.*) Asking a passenger in a stopped vehicle for identification does not impermissibly extend the

stop, so Trooper Coda remained on-mission when he obtained Wilburn's license. *See Rodriguez*,

575 U.S. at 351 (treating the officer's request for a passenger's license as within the lawful portion

of the traffic stop).

Trooper Coda then mentioned the swerving he witnessed and asked whether Dillon had

been "falling asleep." Dillon did not deny the swerving. Instead, he explained that when he tried

to put change from the recent toll booth into his pocket, he inadvertently swerved. (*Id.* at 3:08–

3:30.) Trooper Coda's questions about the swerving go to the heart of the reason for the traffic

stop, so they are no doubt permissible.

Before returning to his vehicle, Trooper Coda asked Wilburn about the identification he

provided and whether he was from Detroit. (*Id.* at 3:30–3:42.) Wilburn confirmed that he was from

Detroit. (*Id.*) This question was closely tied to Trooper Coda's ability to obtain Wilburn's

identification in the first place, and therefore did not unlawfully extend the stop. *Accord Rodriguez*,

575 U.S. at 351 (also allowing the officer to run a warrant check on the passenger).

Less than two minutes after he first approached the Rav4, Trooper Coda returned to his

vehicle. (Gov't Ex. 1, at 4:00.) From the Court's review of the video and Trooper Coda's

testimony, nothing about the initial two-minute encounter with Dillon and Wilburn impermissibly

extended the traffic stop. By this point, Trooper Coda's partner, Trooper Marmol, arrived on the

scene and joined Trooper Coda in his vehicle. While they are not seen on video, the dashboard

camera recording captured the audio of Trooper Coda telling Trooper Marmol that he planned to

"do a quick warning." (*Id.* at 5:40.) Trooper Coda then began filling out the citation to give to

Dillon. As he did this, Trooper Coda decided to also run a criminal history search for Wilburn and

Dillon. (*Id.* at 11:35–15:00.) The audio then captures Troopers Coda and Marmol discussing the

lengthy criminal history their search uncovered. (*Id.*; ECF No. 85, at 91:2–8.)

The Court concludes that the moment Trooper Coda ran a search for Wilburn and Dillon's

criminal histories, despite already deciding to issue a traffic citation, is the earliest potential

*Rodriguez* moment. While running a search for active warrants for the driver and passenger may be

a permissible task during a traffic stop, *see Rodriguez*, 575 U.S. at 354, it is not clear that running a

full criminal history search is tied to the purpose of the stop. A full criminal history search does not

bear an obvious relation to the swerving Trooper Coda used to justify stopping Wilburn and Dillon.

So the Court will follow the approach taken in *Green*, and assume for the sake of argument that

the *Rodriguez* moment occurred at this earliest potential time. *See* 897 F.3d at 179.

Now that the Court worked its way forward to identify the earliest potential *Rodriguez*

moment, it must work its way backwards to see whether Trooper Coda had a reasonable suspicion

that Wilburn was involved in illegal activity when the *Rodriguez* moment occurred.[24] So what did

Trooper Coda know about Wilburn and Dillon when he began running the criminal history search?

Well, for starters, Trooper Coda knew that the DEA believed Wilburn and Dillon were transporting

drugs from Detroit to Pittsburgh—Trooper Coda knew this before even making the stop. Second, he

knew that the men said they had just spent a "couple of days" in Detroit, which made their lack of

luggage suspicious. Third, he knew that Dillon and Wilburn provided identification cards showing that

they lived in different states. (ECF No. 85, at 72:9–16.) Finally, he knew Wilburn and Dillon appeared

"extremely nervous." If all of that information adds up to reasonable suspicion of criminal activity,

---

[24] For the reasons noted above, the Court will not apply the collective knowledge doctrine to impute all of DEA's knowledge of Wilburn's alleged criminal activity onto Trooper Coda. While the United States argued that the collective knowledge doctrine would easily supply the reasonable suspicion needed to justify Trooper Coda's conduct during the stop, Wilburn has raised substantial equitable and legal concerns with applying that doctrine here, with which the Court agrees. Because the Court concludes that it should resolve Wilburn's motion without applying the collective knowledge doctrine, the Court will only consider Trooper Coda's testimony during the suppression hearing and the dashboard camera footage from his vehicle showing his roadside interaction with Wilburn and Dillon.

then Trooper Coda was justified in continuing the stop beyond addressing the traffic violation. So the Court will determine whether each of these pieces of information is relevant to the reasonable suspicion analysis, then decide whether the aggregate information amounts to reasonable suspicion.

The first piece of information Trooper Coda knew at the *Rodriguez* moment was that the DEA suspected Wilburn of drug trafficking. While the Court will not impute all of the DEA's knowledge onto Trooper Coda through the collective knowledge doctrine, the tip Trooper Coda received from the DEA is still important and should be considered. In a sense, the DEA information is at a minimum analogous to a tip from a known source or an identified 9-1-1 caller. Even if it is not reasonable suspicion in its own right, it gave Trooper Coda substantial reason to suspect Wilburn might be engaged in criminal activity. And if Trooper Coda acquired more information that corroborated the DEA's tip, then Trooper Coda would have all the more reason to believe the DEA had their information right.

Trooper Coda testified that on the day of the traffic stop, the DEA told him they suspected Wilburn's vehicle was likely transporting heroin. The DEA also provided Trooper Coda with the vehicle's make, model, color, and license plate. And the DEA told Trooper Coda the suspected occupants' names, as well as their point of departure and intended destination. What's more, the DEA provided periodic updates on the Rav4's location before it passed Trooper Coda's post. (ECF No. 85, at 61:3–62:9.) The information Trooper Coda learned from observing the vehicle and speaking with Wilburn and Dillon before the *Rodriguez* moment was all consistent with and corroborated the DEA's information. So Trooper Coda would have had substantial reason to believe that the DEA's tip that Wilburn was moving heroin was reliable.

The second bit of relevant information was Trooper Coda's observation that there was no luggage in Wilburn's vehicle. Trooper Coda testified that, because the Rav4 is a hatchback-style

vehicle, he could see the interior of the cab and into the trunk. (*Id.* at 67:23–68:18.) That lack of luggage, Trooper Coda testified, was inconsistent with Wilburn and Dillon's story about their trip, and consistent with drug trafficking. (*Id.*) In Trooper Coda's view, two adults on a multi-day trip "would at least have some type of duffel bag, some type of clothing with them." (*Id.*) Trooper Coda's belief that the lack of luggage suggested drug trafficking activity aligns with the Third Circuit's decision in *Wilson*, which the Court of Appeals issued after Trooper Coda testified. *See* 960 F.3d at 145–46 (noting the suspicious lack of luggage in similar circumstances).

Wilburn argues that Trooper Coda's testimony that there was no luggage in the Rav4 is factually incorrect, since Trooper Coda also testified that Wilburn retrieved his identification from "a backpack or a bag or something in the back seat." (ECF No. 85, at 86:10–11.) But the Court understood Trooper Coda's testimony to mean that there were no duffle bags or suitcases—or other items that the term "luggage" more readily conjures—in the vehicle that would suggest the sort of trip Dillon and Wilburn described. And even if there were a bag of some sort in the back seat, it would still be out of the ordinary for two adults to go on a long-distance trip for several days and only bring a single backpack for the both of them. So, in the Court's estimation, Trooper Coda's observation that there was no luggage in the Rav4 is a meaningful piece of information in the reasonable suspicion inquiry.

Third, Trooper Coda noticed during his initial interaction with Wilburn and Dillon that the two men provided identification from different states. He also verified the DEA's information that Wilburn and Dillon were headed from Detroit to Pittsburgh. As Trooper Coda later testified, it was suspicious to find "two people from two different states traveling from a third state, which is a source location for heroin and Fentanyl, going to a source destination for heroin and Fentanyl." (*Id.* at 72:10–13.) In Trooper Coda's view, that information suggested possible drug trafficking.

In that respect, Trooper Coda's suspicion based on Wilburn and Dillon's travel itinerary tracks the Third Circuit's discussion in *Garner*. *See* 961 F.3d at 272 (noting, during the reasonable suspicion analysis, the officer's discovery that the driver and passenger were "traveling along I-81 between New York City and Hagerstown, which [the officer] knew to be a drug trafficking corridor"). So Wilburn and Dillon's different states of residence and their travel destinations provided Trooper Coda with evidence of criminal activity.

Finally, Trooper Coda testified that both Wilburn and Dillon, appeared "extremely nervous throughout the entire traffic stop"—including the initial interaction. (ECF No. 85, at 69:7–21.) Wilburn argues that the Court should entirely discount Trooper Coda's reliance on his and Dillon's nervousness because there are many reasons someone might be nervous during a traffic stop that are wholly divorced from criminal activity. This Court might, as a more general matter, be inclined to agree that nervousness when stopped by the police on the highway is a poor indicator of criminal activity. The problem for Wilburn, however, is that the Third Circuit consistently treats nervousness as a factor officers can consider when developing reasonable suspicion. *See, e.g.*, *Garner*, 961 F.3d at 272 (Defendants "seemed extremely nervous throughout the stop."). So it would be difficult for this Court to prohibit Trooper Coda from considering information that our Court of Appeals says is both acceptable and relevant. *See United States v. Burrus,* No. 20-1521, 2021 WL 567800, at *4 (3d Cir. Feb. 16, 2021).

In sum, Trooper Coda knew: (1) the DEA's tip that Wilburn and Dillon were transporting heroin; (2) the suspicious lack of luggage for a multi-day trip; (3) the travel itinerary along a known drug trafficking corridor; and (4) their considerable observed nervousness. The Court concludes that each of these pieces of information known to Trooper Coda by the time he began the criminal history search provided some evidence of criminal activity, and they tended to corroborate one

another. In the aggregate, that evidence amounted to a particularized and objective basis for suspecting Wilburn of transporting drugs.

Armed with reasonable suspicion of drug activity, Trooper Coda lawfully extended the stop. As he investigated Wilburn's suspected criminal activity, Trooper Coda's suspicion only grew. The review of the criminal history search showed that either Dillon or Wilburn had a lengthy criminal history. (ECF No. 85, at 90:6–91:8.) When Trooper Coda questioned Dillon and Wilburn separately, he found a key inconsistency between Wilburn and Dillon's stories about their trip. Dillon told Trooper Coda the purpose of the trip was to take Wilburn to see a doctor in Detroit. (*Id.* at 72:2–8.) But Wilburn never mentioned seeing a doctor in Detroit when he spoke with Trooper Coda. (*Id.* at 72:9–16.) Instead, Wilburn told Trooper Coda that he and Dillon went to Detroit to see some friends. (*Id.*) During his investigation into Wilburn's possible drug activity, Trooper Coda's reasonable suspicion never waned. To the contrary, all things considered, Trooper Coda reasonably became more confident that there were drugs in the Rav4.

From there, Trooper Coda asked Dillon for consent to search the Rav4, which Dillon provided. Once he began his search, it did not take Trooper Coda long to spot the "kinked" center console in the Rav4. When he pulled back the panel of the kinked center console, he found a quarter kilogram of heroin. As he continued his search, he found a handgun. Roughly twenty-two (22) minutes after Trooper Coda first approached the Rav4, he and Trooper Marmol placed Dillon and Wilburn under arrest.

For the reasons stated, the Court concludes that the stop and roadside investigation both accorded with the Fourth Amendment's protection against unreasonable seizures, and as such, suppression of the fruits of the stop and search is not warranted.

**IV.**     **CONCLUSION**

The Court concludes that, at the very least, Agent Laukaitis acted in good faith reliance on the Cell Site Location Information Warrant. The Court separately concludes that the Magistrate Judge had probable cause to issue the Webster Ave. Warrant. And the Court concludes that Trooper Coda had reasonable suspicion to initiate the traffic stop of the Rav4 and did not unlawfully extend the stop. For these reasons, Wilburn's Motion to Suppress (ECF No. 52) is denied.

An appropriate Order will follow.


   s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:   April 8, 2021

cc:      All counsel of record